**Rita GEIBEL, Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**Civ. A. No. 85–2594.**

United States District Court, W.D. Pennsylvania.

Aug. 6, 1987.

Louis M. Tarasi, Jr., Pittsburgh, Pa., for plaintiff.

Albert W. Schollaert, Asst. U.S. Atty., Pittsburgh, Pa., for defendant.

## MEMORANDUM OPINION

TEITELBAUM, District Judge.

Rita Geibel brought this medical malpractice action against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 et seq. The case was tried before the Court and for the reasons set forth below, judgment will be entered in favor of the United States.

Geibel was born in 1921 and is a high school graduate. She is a married woman who has two living children. A son died at the age of sixteen, ten years ago, when he fell out of a tree house.

During World War II, Geibel served overseas in the Women's Army Auxiliary Corps from 1943–1945. While in the service, Geibel was hit by a softball on her right leg during a game. Upon examination of the injury, varicose veins were discovered. When Geibel attempted to reenlist in 1946, she was rejected because of high blood pressure. In 1973, she was awarded a ten percent service-connected disability pension based upon high blood pressure.

From January to February 1981, Geibel was a patient at the Butler Veteran's Administration Medical Center ("BVAMC") for treatment of high blood pressure, tearfulness and anxiety. Dr. Lon H. Preston, the admitting physician, prescribed several different types of anti-hypertension medication including, but not limited to, Hydrochlorothiazide and Inderal, in conjunction with a low salt diet. Geibel had never taken drugs prior to this hospitalization. She displayed an adverse reaction to much of the medication and an overall sensitivity to drug therapy. Because Geibel experienced nausea, vomiting, cramps, dizziness and sleeplessness, all medication was discontinued. When her blood pressure dropped, Dr. Preston discharged Geibel, but continued to monitor her condition on an outpatient basis. As an outpatient, Geibel's high blood pressure eventually required treatment with a daily dose of 25 milligrams of Hydrochlorothiazide and 10 milligrams of Inderal in the morning followed by 20 milligrams of Inderal at bedtime.

In March, 1981, Geibel was admitted to The Mercy Hospital of Pittsburgh ("Mercy") for continuing pain on her left side which she claimed to have been experiencing since her introduction to drug therapy at the BVAMC. She underwent a gastroscopy which indicated three duodenal ulcers and a hiatal hernia. Geibel was treated for epigastric problems as well as inner ear problems. She continued taking 25 milligrams of Hydrochlorothiazide daily along with 20 milligrams of Inderal in the morning coupled with another 20 milligrams of Inderal at bedtime for high blood pressure.

Geibel was readmitted to the BVAMC on May 27, 1981 for reevaluation of duodenal ulcer disease and hypertension. She was again assigned to Dr. Preston's care. She was discharged June 10, 1981 and continued the same course of drug treatment.

The hospitalization at issue in this lawsuit began June 30, 1981 when Geibel was admitted to the BVAMC for high blood pressure after complaining of severe vertigo for approximately one half of an hour. She was admitted to the hospital after being examined by a Dr. Abbatiello who detected a rash on her arms which, according to plaintiff's testimony at trial, the doctor believed to have been an allergic reaction to Hydrochlorothiazide.

On July 1, 1981, Dr. Raj K. Marwaha, having been randomly assigned to the case, examined Geibel. She complained of the rash on her arms. At this point, the testimony of Geibel contradicts that of Dr. Marwaha. According to Geibel, Dr. Marwaha said, "There's no rash on your arms. Cut your fingernails. You're scratching yourself." The plaintiff further testified that upon examination of her feet, Dr. Marwaha found that she had athlete's foot between her toes and shouted, "Don't you ever wash your feet?" Questioning Dr. Marwaha's drug therapy, Geibel claims that her inquiries were met with a curt, "I am the Doctor."

Dr. Marwaha, on the other hand, denied the abusive language. According to Dr. Marwaha, he informed Geibel that the rash was not "violent" enough to be an allergy, and that, in fact, he saw no rash. After examining her feet, Dr. Marwaha recalls having said, "There's some dirt between your toes." Dr. Marwaha testified that Geibel then snapped back with, "Do you think I'm dirty?" His response was, "Well, that's all right, don't worry about that." Dr. Marwaha went on to say that Geibel seemed to dislike anything he said and appeared to have difficulty understanding his English as it is tainted with an Indian accent.

Dr. Marwaha increased the dosage of Hydrochlorothiazide and Inderal to 40 grams of Inderal twice a day and 50 milligrams of Hydrochlorothiazide daily. Geibel perceived the double dosage as negligent and "upsetting" conduct on the part of Dr. Marwaha. Dr. Marwaha testified that the increase of her prescribed medication was an effort to control her already high blood pressure.

Geibel then complained to the hospital administration that Dr. Marwaha's care did not meet with her approval. Geibel voiced her displeasure at a meeting with the Chief of Medicine. In an effort to accommodate the patient, Geibel was thereupon returned to the care of Dr. Preston. The staff also suggested that Geibel undergo psychiatric and neurologic evaluation, which she declined.

Geibel filed an administrative claim with the Veteran's Administration alleging that she was severely over-drugged on July 1, 1981 at the BVAMC. In her administrative claim, she described the nature and extent of her injury as "negligently over-drugged by the agents and/or employees of the Veteran's Administration which resulted in severe varicose veins, high blood pressure and total disability." The Veteran's Administration denied Geibel's claim and she subsequently brought suit under the FTCA.

Geibel's basic contentions stem from two related theories. First, Geibel contends that the administration of a double dosage of Hydrochlorothiazide and Inderal was negligent, and caused physical problems. Specifically, plaintiff contends that the BVAMC was negligent in failing to consider Geibel's age at the time (60 years) and history of allergic reaction to medication. The physical ailments allegedly suffered as a result include, but are not limited to, "gastroesophageal reflux with hiatal hernia; esophageal stricture; deep vein thrombophlebitis, severe varicosity in both legs; and veneous insufficiency." As a consequence of receiving the alleged overdose of medication, Geibel seeks to recover past and future medical expenses.

Second, her position as the Court understands it, is that the abrasive interaction between Geibel and Dr. Marwaha caused emotional trauma and possibly psychoso-

matic ailments. Specifically, Geibel contends that Dr. Marwaha breached the medical standard of care by allegedly refusing to treat Geibel with dignity and human kindness. Dr. William L. Bair testified as an expert witness on Geibel's behalf. Dr. Marwaha's behavior, in failing to recognize a patient's sense of helplessness and fear, was deemed by Dr. Bair to be "inappropriate." Dr. Bair testified that Dr. Marwaha's conduct fell below any appropriate standard of care. The alleged deviant behavior culminated in what Dr. Bair described as an iatrogenic disorder, which refers to the adverse effects induced by a physician in caring for his patients. This includes not only direct injuries which may result from therapeutic or diagnostic measures, but also the hurt that can be inflicted by words or actions. Dr. Bair connected some, not all, of Geibel's subsequent ailments to an iatrogenic disorder. Geibel testified that, following her interaction with Dr. Marwaha, she was upset, increasingly agitated, easily argumentative and irritable. Her testimony was corroborated by her husband. She seeks to recover damages for medical expenses related to psychiatric treatment, emotional distress and pain and suffering.

Defendant, United States of America, contends that the dosage was a proper response to Geibel's high blood pressure and that Dr. Marwaha's "bed side manner" was in no way improper. Defendant further contends that if Dr. Marwaha's increase in Geibel's medication and/or his behavior fell below a reasonable standard of care, these actions cannot be causally linked to Geibel's subsequent ailments.

Defendant contends that Geibel was never administered an "overdose" of Hydrochlorothiazide and Inderal during her hospitalization at the BVAMC from June 30, 1981 through July 15, 1981, rather that the medication administered to Geibel during this hospitalization met the appropriate standard of care.

Further, defendant contends that the medical conditions suffered by Geibel, i.e. a hiatal hernia and varicose veins, were clearly documented prior to the hospitalization in question. In addition, defendant contends that Geibel's other contentions as to her medical condition have never been medically documented.

Defendant also contends that Dr. Marwaha's bedside manner was in no way inappropriate. Any emotional condition allegedly suffered by Geibel cannot be causally connected to Dr. Marwaha's behavior. Finally, defendant contends that the Court lacks jurisdiction to consider plaintiff's claim of emotional trauma on the basis that Geibel failed to comply with the provisions of the FTCA regarding this claim.

### Administrative Claim

The filing of an administrative claim is a jurisdictional prerequisite that cannot be waived. *United States v. Kubrick*, 444 U.S. 111, 117–118, 100 S.Ct. 352, 356–57, 62 L.Ed.2d 259 (1979); *Apollo v. United States*, 451 F.Supp. 137 (M.D.Pa.1978). There is no clear consensus on the requirements of an administrative filing. Where the defendant has been put on notice of the incident out of which the cause of action arose, has been informed in unambiguous detail of the circumstances which form the basis of the claim and has been presented with a claim for a sum certain representing damages, the Third Circuit has refused to recognize an argument that jurisdiction is lacking. *Farr v. United States*, 580 F.Supp. 1194 (E.D.Pa.1984); *Tucker v. U.S. Postal Service*, 676 F.2d 954 (3rd Cir.1982).

Defendant had moved to dismiss the claims of Geibel pertaining to any emotional trauma and/or other psychological impairment. The Government maintained that the plaintiff failed to provide sufficient information regarding her injury so as to put the United States on notice that she was presenting a claim for emotional trauma. Geibel maintained that she complied with the administrative claim procedure, i.e., that her claim was broad enough to put the Government on notice. Judge Farnan, to whom the case was previously assigned, denied the motion without opinion.

The doctrine of law of the case provides that when one district judge has rendered a decision in a case, and the case

is later transferred to another judge, the successor should not ordinarily overrule the earlier decision. *Loumar, Inc. v. Smith,* 698 F.2d 759 (5th Cir.1983). The Third Circuit follows a restrictive view of the circumstances in which the work of one judge may be undone by another. Under law of the case doctrine, once an issue has been decided it will not be relitigated in the same case except in unusual circumstances. *Hayman Cash Register Co. v. Sarokin,* 669 F.2d 162 (3d Cir.1982). The Third Circuit has summarized four commonly recognized exceptions to the doctrine. First, a successor judge may entertain a timely motion to reconsider the conclusions of an unavailable predecessor. Second, a judge may address an issue previously decided in the same litigation if new evidence is available to the second judge when hearing the issue. A third exception to the law of the case doctrine is that every court has a duty to apply a superceding rule of law despite its prior decisions to the contrary when the new legal rule is valid and applicable to issues of the case. Finally, law of the case does not apply if the decision was clearly erroneous and would work a manifest injustice. *Schultz v. Onan Corp.,* 737 F.2d 339 (3d Cir.1984). The Court finds no such circumstances in the case at bar. Accordingly, this issue shall not be reconsidered.

### Physical Claim

The liability of the United States under the FTCA is determined by the law of the state in which the tortious conduct occurred. *United States v. Muniz,* 374 U.S. 150, 153, 83 S.Ct. 1850, 1853, 10 L.Ed.2d 805 (1963); 28 U.S.C. § 1346(b). Proof of medical malpractice in Pennsylvania requires evidence of the standard of medical care and a showing by a preponderance of the evidence that there was a departure from this standard. *Brannan v. Lankenau Hospital,* 590 Pa.Super. 588, 417 A.2d 196 (1980).

Geibel originally alleged that as a result of the administration of a "double dosage" of Hydrochlorothiazide and Inderal, she sustained bodily injury, as well as emotional trauma. Following the close of discovery, defendant moved for summary judgment, asserting that because Geibel's expert report contained no opinion as to any medical malpractice alleged, Geibel could not sustain her burden of proof under Pennsylvania law. The burden of proof, in a medical malpractice action under Pennsylvania law, is upon the plaintiff to show that the defendant failed to exercise the reasonable skill and knowledge required under the circumstances. To satisfy this burden of proof the plaintiff must introduce expert medical testimony to show the defendant's conduct varied from accepted medical practice. *Brannan v. Lankenau Hospital,* 417 A.2d at 199. However, there is an exception to the rule when "the matter under investigation is so simple, and the lack of skill or want of care so obvious, as to be within the range of ordinary experience and comprehension of even nonprofessional persons." *Brannan v. Lankenau Hospital,* 417 A.2d at 201, quoting *Chandler v. Cook,* 438 Pa. 447, 451, 265 A.2d 794 (1970). The Court denied summary judgment, finding that Geibel's contention that Dr. Marwaha failed to take into account her age and allergic reactions to drugs could fit within the exception to the requirement of expert medical testimony.

At trial, plaintiff's expert, Dr. Bair, was qualified to testify only to Geibel's psychiatric state and his testimony was in fact limited to her claim for emotional trauma. Geibel testified that, following the incident with Dr. Marwaha, her "whole life has changed." She testified that she suffers from physical ailments including what she perceived to be "severe" variscosities from the waist down, three duodenal ulcers, ringing in her ear and sleeplessness. On cross-examination and throughout the course of the trial, it became evident that all of these ailments had been documented prior to the hospitalization at issue. Although at trial Geibel appeared to be bent on tying the increase in dosage to her physical problems, plaintiff's proposed findings of fact and conclusions of law made no mention of her physical claim. Therefore, it appears that Geibel has abandoned her theory that the "double dosage" constituted professional negligence.

■ Even if plaintiff were to stand by her physical claim, the Court finds that the administration of the alleged "double dosage" was not negligent. Dr. Lon H. Preston, Geibel's preferred physician at the BVAMC, testified that the amount of Hydrochlorothiazide and Inderal which he had prescribed for Geibel were "very low doses." Dr. Robert H. McDonald, a specialist in pharmacology, epidimeology and internal medicine, testified as a medical expert on behalf of the Government. Dr. McDonald testified that the dosage prescribed by Dr. Marwaha was considered a starting dose by the majority of medical practitioners in Western Pennsylvania. He testified that the lower doses—Dr. Preston's initial prescription—that were then doubled by Dr. Marwaha actually represent "cautious care." Dr. McDonald further testified that Dr. Marwaha's increase in dosage from a cautious dose to a low starting dose met the applicable standard of care associated with the treatment of high blood pressure. He rendered this opinion within a reasonable degree of medical certainty based upon a national standard of care. Geibel offered no expert testimony to controvert Dr. McDonald's testimony.

Dr. Marwaha testified that the high blood pressure readings on admission of Geibel warranted treatment by medication. He further testified that it was his practice to slightly increase the medication of a patient who had been undergoing drug therapy at the time of admission to the hospital. Dr. Marwaha testified that he reviewed Geibel's chart, which included prior hospitalizations. There is no evidence to suggest that Dr. Marwaha breached a standard of care by failing to consider Geibel's age and history of allergic reaction to drugs. It was his opinion, after reviewing her record, that Geibel required a higher, yet still conservative, level of anti-hypertension medication commensurate with the increase in her already high blood pressure. Dr. Marwaha did not deviate from the required standard of care. The plaintiff's physical claim affords no basis for relief.

### Emotional Trauma Claim

■ Dr. Bair testified that Dr. Marwaha's treatment deviated from the required standard of care because Dr. Marwaha failed to recognize Geibel's state of helplessness and fear and treat it accordingly. Dr. Bair testified that Geibel suffers from a chronic depression of "moderate to major propensities" as evidenced by a decline in enthusiasm, sleeping disorder, increased irritability, a general sense of chronic agitation, uneasiness, fear of the future and worry about her physical health. In essence, it was Dr. Bair's opinion that Geibel has been experiencing an iatrogenic disorder ever since her interaction with Dr. Marwaha in July, 1981.

The term "iatrogenic disorder" refers to the adverse effects which are induced by a physician caring for his patients, not only direct injuries which may result from therapeutic and diagnostic measures, but also the hurt that can be inflicted by words or actions. The term generally carries with it the connotation of an untoward effect which could have been avoided by the exercise of reasonable care and knowledge on the part of the physician. Dr. Bair further testified that this is a disorder arising out of a patient's perception of a physician's words and actions. Dr. Bair established the duty of a physician to affirmatively avoid inducing an iatrogenic disorder in a patient as the standard of care due that patient. The alleged breach of such standard by Dr. Marwaha was, in Dr. Bair's opinion, a substantial contributing cause of Geibel's present condition. There was no expert testimony to the contrary.

This Court's research, however, disclosed no case law which recognizes the standard set forth by Dr. Bair as one on which legal liability may be imposed. For the purposes of this decision, however, it is assumed that such a standard is legally cognizable.

Geibel claims that Dr. Marwaha breached the standard of care owed to plaintiff; his alleged remarks relative to her cleanliness and appearance along with his abrupt behavior resulted in emotional harm to Geibel. Dr. Marwaha testified that he did not use such language, maintained the proper decorum, and consequently did not deviate from the required standard of care. Plain-

tiff's narrative of the facts is in stark contrast with Dr. Marwaha's testimony. Given that Geibel was hospitalized for high blood pressure, vertigo, severe varicose veins, duodenal ulcer disease and a hiatal hernia, it is just as likely that she misunderstood or misinterpreted Dr. Marwaha's remarks as that the incident occurred as she related it. Therefore, the Court is constrained to accept Dr. Marwaha's version as the more credible.

Even assuming plaintiff's version of the incident could be accepted as true, it is questionable whether any actual injuries were sustained by the plaintiff as a result. Dr. Bair does causally connect Geibel's emotional trauma with Dr. Marwaha's treatment. While his testimony is uncontroverted it is based only on Dr. Bair's reading of plaintiff's and Dr. Marwaha's depositions and a single interview with Geibel, soley for the purposes of this litigation. The examination lasted for only one hour and there was no further contact between Geibel and her expert. Dr. Bair formulated his opinion without the benefit of Geibel's extensive hospital records. Moreover, no explanation was offered as to why medical records in existence and readily available were not given to Dr. Bair for his review. Defense counsel on cross-examination probed Dr. Bair regarding any bias he may have had on the case. In response, Dr. Bair acknowledged that he was asked to interview Geibel by plaintiff's counsel. Dr. Bair testified that, as a personal friend of plaintiff's counsel, he found plaintiff's counsel to be a very sensitive person and one able to see clearly that a patient is suffering from emotional as well as somatic disease.

Because Dr. Bair was not privy to the plaintiff's medical record, he was not aware that the emotional problems which he recognized were documented long before Geibel came in contact with Dr. Marwaha. As early as January 26–28, 1981 the record reflects Geibel's tearfulness, anxiety and sleeplessness as documented in the nurse's notes. In February, 1981 Paula Worsley, R.N., made a notation in plaintiff's chart that Geibel should "try to avoid stress situations." On admission to the BVAMC June 30, 1981 before she was seen by Dr. Marwaha, the record reflects Geibel's emotional disorder. Her patient profile on admission states that she worried about her husband and that she often thought about her deceased son. The same day, Pat Merriman, R.N., made a notation in plaintiff's chart that the BVAMC staff's long range goals should include assisting Geibel to learn to live with the limitation of a hypertensive lifestyle. Again on June 30, 1981, the record shows that Geibel "seems discouraged in being sickly this past year."

Even if liability could be found, the bulk of medical expenses for which plaintiff requests recovery is for future psychiatric medical bills. Plaintiff claims that the future cost of treating her depression by psychiatric therapy will be approximately $30,000. However, there is no indication that Geibel wants psychiatric treatment. She has declined such treatment in the past, as evidenced by her refusal of psychiatric evaluation when offered to her during her June—July, 1981 hospitalization. Furthermore, there is no indication that she will seek psychiatric help, but every indication that she believes that her problems are purely physiological. Damages must be proven with reasonable certainty. They cannot be speculative, conjectural or remote. *Gordon v. Trovato*, 234 Pa.Super. 279, 338 A.2d 653, 657 (1975). Plaintiff's claim for damages as compensation for future psychiatric care goes beyond speculation. The record establishes with reasonable certainty that she will *not* incur any of these expenses.

An appropriate order will be entered.