Susan OSWALD and Larry Oswald, Individually and as Administrators of the Estate of Natalie Sue Oswald, Appellants,

v.

Larry R. LeGRAND, Barry Smith, Christopher Clark, and Mercy Health Center, Appellees.

No. 89–166.

Supreme Court of Iowa.

Feb. 21, 1990.

As Amended on Denial of Rehearing April 12, 1990.

Tom Riley and Sara Riley Brown of the Tom Riley Law Firm, P.C., Cedar Rapids, for appellants.

David L. Hammer and Angela C. Simon of Hammer & Simon, Dubuque, for appellees Larry R. LeGrand, Barry Smith and Christopher Clark.

Alfred E. Hughes of Hughes & Trannel, Dubuque, for appellee Mercy Health Center.

Considered by McGIVERIN, C.J., and CARTER, LAVORATO, NEUMAN, and ANDREASEN, JJ.

NEUMAN, Justice.

This appeal challenges a grant of summary judgment for medical professionals in a case involving the spontaneous abortion of a 19–22 week-old fetus. The trial court barred the plaintiffs from introducing expert testimony due to their failure to timely designate an expert in accordance with Iowa Code section 668.11(2) (1987). Accordingly, the district court determined that plaintiffs could not generate a material issue of fact concerning the defendants' negligence. Because we conclude that expert testimony is crucial to some but not all of plaintiffs' claims, we affirm in part, reverse in part, and remand for further proceedings.

I. This case reaches us on appeal from pretrial summary judgment for the defendants. Our review under such circumstances is well established:

> The burden is upon the party moving for summary judgment to show absence of any genuine issue of a material fact. All material properly before the court must be viewed in the light most favorable to the opposing party.

*Daboll v. Hoden,* 222 N.W.2d 727, 731 (Iowa 1974). Because resolution of issues of negligence and proximate cause turns on the reasonableness of the acts and conduct of the parties under all the facts and circumstances, actions for malpractice "are ordinarily not susceptible of summary adjudication." *Id.* at 734; *accord Donovan v. State,* 445 N.W.2d 763, 766 (Iowa 1989); Iowa R.App.P. 14(f)(10). In a case like this one where plaintiffs are limited in the presentation of expert testimony, the issue becomes "not whether there was *negligence* in the actions of the defendant but whether there was *evidence* upon which liability could be found." *Donovan,* 445 N.W.2d at 766.

To establish a prima facie case of medical malpractice, a plaintiff must produce evidence that (1) establishes the applicable standard of care, (2) demonstrates a violation of this standard, and (3) develops a causal relationship between the violation and the injury sustained. *Kosburg v. Washington Hosp. Center, Inc.,* 394 F.2d 947, 949 (8th Cir.1968); *Daboll,* 222 N.W.2d at 734. Ordinarily, evidence of the applicable standard of care—and its breach—must be furnished by an expert. *Grosjean v. Spencer,* 258 Iowa 685, 692, 140 N.W.2d 139, 143 (Iowa 1966). This court has recognized two exceptions to this rule:

One is where the physician's lack of care is so obvious as to be within the comprehension of a lay[person] and requires only common knowledge and experience to understand. The other exception is really an example of the first situation. It arises when the physician injures a part of the body not being treated. *Buckroyd v. Bunten*, 237 N.W.2d 808, 811–12 (Iowa 1976); *Perin v. Hayne*, 210 N.W.2d 609, 613 (Iowa 1973); *Grosjean*, 258 Iowa at 692, 140 N.W.2d at 144. It is the "common knowledge" exception upon which plaintiffs base their argument for reversal in the present case.

II. The record upon which the trial court made its summary judgment ruling consisted of the following: affidavits by the plaintiffs, affidavits by the doctors, and affidavits by several medical professionals attesting to defendants' nonnegligence based on their review of the medical records; the medical records themselves; and selected portions of deposition testimony given by plaintiffs, doctors, and hospital nursing staff. Viewing this record in the light most favorable to plaintiffs, and resolving factual disputes in that same spirit, we accept the following facts as established for purposes of this appeal.

Plaintiffs Susan and Larry Oswald have been married for ten years and are the parents of two healthy sons. During Susan's third pregnancy, she began experiencing bleeding and painful cramping just prior to her five-month checkup. At that time, she was under the care of a family practice physician, defendant Barry Smith. He ordered an ultrasound test and Susan was then examined in his office by one of his colleagues, defendant Larry LeGrand, an obstetrician. Neither the test nor the examination revealed an explanation for the bleeding and Susan was instructed to go home and stay off her feet. Later that day, however, Susan began to bleed heavily. She was taken by ambulance to defendant Mercy Health Center. The bleeding eventually stopped, Dr. Smith's further examination failed to yield a cause of the problem, and Susan was discharged the following day with directions to take it easy.

The following day, Susan's cramping and bleeding worsened. Susan thought she was in labor and feared a miscarriage. She was unable to reach Dr. Smith by telephone and so Larry drove her to the emergency room at Mercy. There Dr. Christopher Clark, another physician in association with Smith and LeGrand, examined her. He advised her there was nothing to be done and she should go home. Larry was angered by this response and insisted Susan be admitted to the hospital. Dr. Clark honored this request and Susan was transferred to the labor and delivery ward.

In considerable pain and anxious about her pregnancy, Susan's first contact on the ward was with a nurse who said, "What are you doing here? The doctor told you to stay home and rest." Susan felt like "a real pest." A short while later, while attached to a fetal monitor, Susan was told by another nurse that if she miscarried it would not be a baby, it would be a "big blob of blood." Susan was scared.

The next morning, an argument apparently ensued over which physician was responsible for Susan's care. Standing outside Susan's room, Dr. Clark yelled, "I don't want to take that patient. She's not my patient and I am sick and tired of Dr. Smith dumping his case load on me." At the urging of Larry and a nurse, Dr. Clark apologized to Susan for this outburst. He assured her that he would care for her until he left for vacation at noon that day when he was scheduled to go "off call" and Dr. LeGrand would take over.

Around 9:00 a.m. Susan began experiencing a great deal of pain that she believed to be labor contractions. Dr. Clark prescribed Tylenol and scheduled her for an ultrasound and amniocentesis at 11:00 a.m. By that time, Susan was screaming in pain and yelling that she was in labor. Dr. Clark arrived in the x-ray department halfway through the ultrasound procedure and determined from viewing the sonogram that there was insufficient fluid in the amniotic sac to perform an amniocentesis. He told the Oswalds that the situation was unusual but did not reveal to them his suspicion

that there was an infection in the uterus. He examined Susan abdominally but did not do a pelvic exam. By all accounts, Susan was hysterical and insisting she was about to deliver. Dr. Clark wanted her transferred upstairs for further monitoring. He told Larry to calm her down. Then he left on vacation, approximately one-half hour before the end of his scheduled duty.

Within minutes, Susan began delivering her baby in the hallway outside the x-ray lab. When Larry lifted the sheet covering Susan and "saw [his] daughter hanging from her belly" he kicked open a glass door to get the attention of hospital personnel. Susan was quickly wheeled to the delivery room where two nurses delivered her one-pound baby girl at 11:34 a.m.

After visually observing neither a heartbeat nor any respiratory activity, one of the nurses announced that the baby was stillborn. The nurse wrapped the infant in a towel and placed her on an instrument tray. Ten minutes later, Dr. LeGrand arrived and delivered the placenta. At Susan's request, he checked the fetus for gender. He made no further examination of the infant, assuming it to be a nonviable fetus. After assuring himself that Susan was fine, and offering his condolences to the disappointed parents, he returned to his office.

Meanwhile, Larry called relatives to advise them of the stillbirth. Upon his return to Susan's room, he touched the infant's finger. Much to his surprise, his grasp was returned. Larry told a nurse in attendance that the baby was alive but the nurse retorted that it was only a "reflex motion." The nurses subsequently determined that the baby *was* alive. After having left her on an instrument tray for nearly half an hour, the nurses rushed the infant to the neonatal intensive care unit. The infant, registered on her birth certificate as Natalie Sue, received comfort support measures until she died about twelve hours later. Further facts will be detailed as they become pertinent to the issues on appeal.

III. In January 1987, the Oswalds sued the hospital and doctors Clark, Smith and LeGrand on theories of negligence, negligent loss of chance of survival, breach of implied contract and breach of implied warranty. As to Dr. LeGrand and the hospital, Oswalds additionally alleged gross negligence. Factually, these causes of action were premised on violation of the standard of prenatal care owed to Susan Oswald and alleged negligence in the examination and treatment of Natalie Sue including failure to recognize signs of an imminent premature birth, failure to properly prepare for such delivery, and delaying timely and vital treatment to the infant upon her birth. The Oswalds claimed damages for Natalie Sue's lost chance to live, their loss of society and companionship flowing from Natalie Sue's death, severe emotional distress and anxiety resulting from the defendants' negligence in the care of both Susan and Natalie Sue, and severe emotional distress and mental anguish caused by witnessing the negligent treatment of their newborn infant.

The parties engaged in substantial discovery and plaintiffs successfully resisted two motions for summary judgment. In September 1987, however, the defendants successfully moved to bar the plaintiffs from offering independent expert testimony on their malpractice claim due to plaintiffs' failure to designate an expert witness within the 180–day limit prescribed by Iowa Code section 668.11.[1] Defendants subsequently renewed their motions for summary judgment, each claiming that plaintiffs'

---

1. Section 668.11 provides, in pertinent part:
   1. A party in a professional liability case brought against a licensed professional pursuant to this chapter who intends to call an expert witness of their own selection, shall certify to the court and all other parties the expert's name, qualifications and the purpose for calling the expert ... within one hundred eighty days of the defendant's answer unless the court for good cause not ex parte extends the time of disclosure.

   . . . .

   2. If a party fails to disclose an expert pursuant to subsection 1 or does not make the expert available for discovery, the expert shall be prohibited from testifying in the action unless leave for the expert's testimony is given by the court for good cause shown.

inability to produce expert testimony at trial would preclude them from establishing the requisite standard of care and its alleged breach. Following hearing on the motion, the district court agreed.

Both before the district court, and now on appeal, the Oswalds contend that their case comes within the "common knowledge" exception to the rule requiring expert testimony in medical malpractice actions. In the alternative, plaintiffs insist that they can establish the relevant standard of care through the defendants' admissions against interest, thus obviating the need for independent expert testimony. They also assert that Iowa Code section 668.11 is contrary to public policy.

IV. The case boils down to whether the trial court correctly determined, as a matter of law, that the claims of negligence surrounding the Oswald family's care and treatment are so technical in nature as to require expert testimony to establish the applicable standard of care and its breach. In considering this question, we think it is useful to divide the case into three logical components: (1) the professional care and treatment accorded Susan prior to and during her delivery; (2) the professional care and treatment given Natalie Sue upon her birth; and (3) the emotional impact of (1) and (2) on Susan and Larry as expectant parents. Within these categories, we think the trial court correctly determined that certain conduct of the physicians and hospital could only be properly challenged through independent expert testimony, but that the principal conduct about which plaintiffs complain falls within the knowledge and experience of the average lay jury.

■ A. *Evidence not within common knowledge.* To begin, there is no evidence in this record that more prompt or heroic efforts to sustain Natalie Sue's life would have been successful. Such evidence, if it could be obtained, would be of a technical nature requiring expert testimony that plaintiffs cannot provide. Plaintiffs are unable, under this record, to rebut the affidavit of the attending pediatrician, Dr. Charles Winterwood, that stated "Baby Girl Oswald" was an "extremely immature fetus ... not sufficiently developed to survive." Neither can they rebut his opinion that a gestational age of twenty-four weeks is medically accepted as the earliest point at which infants have been shown to have any chance of survival. Given this evidence, the trial court properly dismissed Susan and Larry's claim of emotional distress flowing from Natalie's lost chance of survival and all of count II of the petition relating to pecuniary loss sustained by Natalie's estate as a result of her wrongful death.

■ Similarly, the record contains no evidence that the doctors' or hospital's treatment of Susan in any way prompted Susan's premature delivery or could have, in any way, prevented it. Such evidence, if it existed, would exceed the ordinary scope of a layperson's knowledge and would require expert testimony. Plaintiffs have come forth with no such proof in response to defendants' motion. The trial court correctly dismissed all of plaintiffs' claims against the defendants on this ground. Because this was the only complaint against Dr. Smith, he has been properly dismissed from the suit.

B. *Evidence within the "common knowledge" exception.* Beyond these fundamental treatment issues, however, lie plaintiffs' claims that the care provided by defendants Clark, LeGrand, and Mercy Hospital fell below the standard of medical professionalism understood by laypersons and expected by them. Into this category fall Nurse Slater's unwelcoming remarks upon Susan's arrival at the birthing area; Nurse Gardner's deprecating description of a fetus as a "big blob of blood"; Dr. Clark's tirade outside Susan's door; Dr. Clark's insensitivity to Susan's insistence that she was in the final stage of labor, leaving her in a hysterical state minutes before her delivery in a hospital corridor while he went off call; Nurse Flynn's determination that the fetus was stillborn, only to discover it gasping for breath half-an-hour later; and Dr. LeGrand's admitted failure to make an independent determination of the viability of the fetus, conceding

it was his obligation to do so. Larry and Susan contend that they have suffered severe emotional distress as a result of these alleged breaches of professional conduct.

■ We note preliminarily that because the Oswalds can sustain no claim of physical injury, they would ordinarily be denied recovery in a negligence action for emotional distress. *Wambsgans v. Price*, 274 N.W.2d 362, 365 (Iowa 1979). An exception exists, however, where the nature of the relationship between the parties is such that there arises a duty to exercise ordinary care to avoid causing emotional harm. *Niblo v. Parr Mfg., Inc.*, 445 N.W.2d 351, 354 (Iowa 1989). Such claims have been recognized in the negligent performance of contractual services that carry with them deeply emotional responses in the event of breach as, for example, in the transmission and delivery of telegrams announcing the death of a close relative, *Mentzer v. Western Union Tel. Co.*, 93 Iowa 752, 768–71, 62 N.W. 1, 5–6 (1895), and services incident to a funeral and burial. *Meyer v. Nottger*, 241 N.W.2d 911, 920 (Iowa 1976). Under the comparable circumstances demonstrated by this record, we think liability for emotional injury should attach to the delivery of medical services. As we observed by way of analogy in *Meyer*, the birth of a child involves a matter of life and death evoking such "mental concern and solicitude" that the breach of a contract incident thereto "will inevitably result in mental anguish, pain and suffering." *Meyer*, 241 N.W.2d at 920 (quoting *Stewart v. Rudner*, 349 Mich. 459, 84 N.W.2d 816). Other authorities are in accord. *See Geibel v. U.S.*, 667 F.Supp. 215, 220 (W.D.Pa.1987) (recognizing malpractice claim for emotional distress based on injury induced by physician through "words or actions" as well as di-

rect injury from therapeutic and diagnostic measures); *Taylor v. Baptist Medical Center*, 400 S.2d 369, 374 (Ala.1981) (recognizing exception to denial of recovery for purely mental anguish where duty "so coupled with matters of mental concern or solicitude, or with the feelings of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering").

■ Insofar as the sufficiency of damages are concerned, the Oswalds' claim appears undisputed.[2] The question is whether these six incidents, if proven at trial, would demonstrate a breach of professional medical conduct so obvious as to be within the common knowledge of laypersons without the aid of expert testimony; or, in the alternative, whether plaintiffs could prove the standard of care and its breach through defendants' own testimony. In other words, is the evidence presented by plaintiffs' resistance to the motion sufficient to overcome summary judgment on defendants' claim that no material dispute exists with respect to the issues of negligence and causation? We are persuaded that it is.

■ The first three incidents described above raise commonly understood issues of professional courtesy in communication regarding a patient's care and treatment. No expert testimony is needed to elaborate on whether the statements by the nurses and Dr. Clark were rude and uncaring; a lay fact finder could easily evaluate the statements in light of the surrounding circumstances to determine whether the language used or message conveyed breached the standard of care expected of medical professionals, and determine the harm, if any, resulting to the plaintiffs. In reaching this conclusion we hasten to emphasize

**2.** Because the trial court determined plaintiffs' proof was insufficient on the elements of negligence and causation, it did not reach the question of damages. The record reveals that both Susan and Larry have undergone psychological counseling in an effort to overcome the stress, anxiety, and depression associated with Susan's fear of becoming pregnant again and Larry's anger and guilt over the extraordinary helplessness he felt as a witness to his wife's painful and humiliating experience at Mercy Hospital. To

the extent that the trial court considered, and dismissed, any claim of intentional infliction of emotional distress due to a perceived lack of "outrageousness" in defendants' conduct, we note that plaintiffs' emotional distress claim has not been pleaded as an independent tort but rather as an element of damages flowing from the underlying breach of professional conduct. Under such circumstances, the dismissal was not warranted because proof of outrageous conduct need not be shown.

that our decision in this case is closely limited to its facts. We in no way suggest that a professional person must ordinarily answer in tort for rudeness, even in a professional relationship. In order for liability to attach there must appear a combination of the two factors existing here: extremely rude behavior or crass insensitivity coupled with an unusual vulnerability on the part of the person receiving professional services.

■ We are similarly convinced that a lay jury is also capable of evaluating the professional propriety of Dr. Clark's early departure from the hospital, knowing that he had left Susan Oswald unattended in a hospital corridor screaming hysterically that she was about to give birth. In a strikingly similar case, a New Jersey court held that a woman claiming medical malpractice based on an "utter lack of attendance" at her delivery in a hospital need not produce expert testimony in order to overcome a motion for summary judgment. *Friel v. Vineland Obstetrical and Gynecological Prof. Ass'n*, 166 N.J.Super. 579, 584, 400 A.2d 147, 149 (1979). We concur in the following observation made by the court in its ruling:

> The question of malpractice in that regard would appear to be within the province of the jury of laymen, depending upon the proofs submitted. 'There are basic aspects of childbirth procedure within the common knowledge of the laity.' (Citation omitted.) Attendance of a patient in labor at or near the moment of giving birth would seem to be an aspect particularly within that knowledge.

*Id.* at 584, 400 A.2d at 149.

■ C. *Evidence demonstrable through defendants' admissions.* Falling outside the expert testimony exception applicable to the preceding claims are the delivery room nurse's failure to correctly determine that the fetus was alive, and Dr. LeGrand's uninformed acceptance of that determination. These facts seem to us to raise issues ordinarily beyond the common knowledge of laypersons. There is evidence in the summary judgment record, however, which could enable the plaintiffs

to establish the applicable standard of care, and its breach, by the defendants' own statements. Other jurisdictions allow such proof and we do not read the proscription of Iowa Code section 668.11 to extend to testimony elicited from defendant parties who are also experts. *See Bauer v. Friedland*, 394 N.W.2d 549, 554 (Minn.App. 1986) (causation issue may be established by defendant doctor's admission); *Novey v. Kishwaukee Community Health Serv.*, 176 Ill.App.3d 674, 680–82, 126 Ill.Dec. 132, 135–36, 531 N.E.2d 427, 430–31 (1988) (breach of standard of care established through testimony of defendant physical therapist); *Niemi v. Upper Peninsula Orthopedic Assoc.*, 173 Mich.App. 326, 433 N.W.2d 363, 366 (App.1988) (applying statute authorizing standard of care through defense experts).

Defendant doctors Smith and Clark (along with Dr. Winterwood who is not named as a defendant) each testified that measurements of heartbeat and respiration should be taken, ordinarily with a stethoscope. Both Larry Oswald and Nurse Frommelt testified that Nurse Flynn performed no more than a brief visual examination of the fetus before pronouncing it stillborn. Dr. LeGrand conceded in deposition testimony that he made no effort to determine whether the infant was alive. He also testified that the responsibility for examining a newborn's vital signs rests with the attending physician and that a nurse is not ultimately responsible for pronouncing a baby dead.

■ Defendants argue that because Natalie Sue's death was inevitable, the emotional distress suffered by the Oswalds is understandable but not compensable. What defendants overlook is the colorable claim of severe emotional distress proximately caused by the equivocation of these health care professionals on the very question of her life or death. Under this record, we think the plaintiffs have produced evidence minimally sufficient to overcome summary judgment on this claim of malpractice.

V. Plaintiffs' final claim—that Iowa Code section 668.11 violates the public poli-

cy of this state—is asserted without authority or persuasive argument. By its terms, the statute provides an exception to its 180–day deadline where good cause for departure from the rule can be shown. Plaintiffs make no claim that the trial court abused its discretion here. The assignment of error is without merit.

In conclusion, we affirm in part, reverse in part, and remand this case for further proceedings not inconsistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.