Lester CAMPBELL, Appellant,

v.

Arnold DELBRIDGE and Covenant
Medical Center, Inc., Appellees.

No. 02–1007.

Supreme Court of Iowa.

Oct. 8, 2003.

Douglas V. Coonrad, Hudson, for appellant.

Joseph L. Fitzgibbons and Ned A. Stockdale of Fitzgibbons Law Firm, Estherville, for appellee Covenant Medical Center, Inc.

Allison M. Heffern and James E. Shipman of Simmons Perrine Albright & Ellwood, PLC, Cedar Rapids, for appellee Arnold Delbridge.

Frank Santiago, Iowa City, and Donald T. Ridley, Watchtower Bible and Tract Society of New York, Inc., Patterson, NY, for amicus curiae Christian Congregation of Jehovah's Witnesses.

LARSON, Justice.

Lester Campbell, a surgical patient at Waterloo's Covenant Hospital, sued the hospital and Dr. Arnold Delbridge, Campbell's treating doctor, for reinfusing Campbell's own blood following surgery. The district court dismissed the suit, and Campbell appealed. We reverse and remand.

## I. *Facts and Prior Proceedings.*

Lester Campbell was admitted to Covenant for a total right knee arthroplasty performed by Dr. Delbridge, an orthopedic surgeon. Campbell is a Jehovah's Witness, and he made it clear in his pre-surgical physical and at his preadmission appointment that his religious beliefs precluded the use of blood or blood products, including his own. His medical chart made numerous references to his refusal to accept blood infusions. Campbell did not receive any blood or blood products during surgery. However, after surgery, Dr. Delbridge ordered the use of a Gish Orthoinfuser (Gish) to collect blood from the surgical site. The doctor decided to use the Gish, as opposed to other devices, because the Gish provided a reservoir where blood can be stored for disposal or possible reinfusion, and it provided the best suction. Further, use of the Gish would preserve Campbell's ability to change his mind about receiving his own blood should it become medically necessary.

The nurse anesthetist who took Campbell to the postanesthesia care unit (PACU) stated in an affidavit that, at the request of Dr. Delbridge, she told the PACU nurses that Campbell was a Jehovah's Witness and was not to be reinfused. The PACU nurses, however, denied receiving this information. The nurse who started the reinfusion admitted in her deposition that she did not look at Campbell's chart for an order to start the reinfusion, as usually required. She based her decision to reinfuse on the fact that the Gish, with its blood reservoir, suggested that reinfusion was to be done. Campbell was reinfused with his own blood for just under an hour.

Campbell sued the doctor and the hospital, alleging negligence, failure to obtain informed consent, breach of contract, medical battery, and invasion of privacy. Campbell had originally indicated he would have an expert witness on the doctor's standard of care, but that witness was withdrawn. Dr. Delbridge moved for summary judgment on the ground that, with-

out expert testimony, Campbell could not make a prima facie showing on any of his theories of recovery. Covenant filed a motion to preclude the plaintiff's medical evidence under Iowa Rule of Civil Procedure 1.508(3) (failure to identify expert) and Iowa Rule of Evidence 5.104(a) (preliminary question of qualification of witnesses to be determined by court).

The court concluded that the plaintiff lacked the necessary expert witnesses to establish liability or damages, and the suit was dismissed.

## II. *Standard of Review.*

The standard of review of a district court's grant of summary judgment is for correction of errors at law. *Kelly v. Iowa Mut. Ins. Co.,* 620 N.W.2d 637, 641 (Iowa 2001). Summary judgment is appropriate only when the moving party shows there are no genuine issues of material fact, and in deciding that issue, we review the record in the light most favorable to the party opposing the motion. *Id.* Another principle is applicable here:

> Because resolution of issues of negligence and proximate cause turns on the reasonableness of the acts and conduct of the parties under all the facts and circumstances, actions for malpractice "are ordinarily not susceptible of summary adjudication."

*Oswald v. LeGrand,* 453 N.W.2d 634, 635 (Iowa 1990) (quoting *Daboll v. Hoden,* 222 N.W.2d 727, 732 (Iowa 1974)).

## III. *The Issues.*

The defendants rely on the principle that, ordinarily, expert testimony is required to establish the applicable standard of care and a breach of it. *See Oswald,* 453 N.W.2d at 635 (to establish prima facie case of medical malpractice, the plaintiff must produce evidence establishing a standard of care, a violation of the standard, and a causal relationship with the injury). The establishment of these criteria must "[o]rdinarily be made through an expert witness." *Id.; see also* Iowa Code § 668.11 (2001):

> 1. A party in a professional liability case brought against a licensed professional pursuant to this chapter who intends to call an expert witness of their own selection, shall certify to the court and all other parties the expert's name, qualifications and the purpose for calling the expert ... within one hundred eighty days of the defendant's answer unless the court for good cause not ex parte extends the time of disclosure.
>
> ....
>
> 2. If a party fails to disclose an expert pursuant to subsection 1 or does not make the expert available for discovery, the expert shall be prohibited from testifying in the action unless leave for the expert's testimony is given by the court for good cause shown.

However, if an issue in a malpractice case may be determined by lay fact finders without the testimony of experts, we have allowed the fact finder to resolve it without expert testimony. For example, in *Oswald* we ruled that expert testimony was not required as to all of the elements of a medical malpractice case. In that case, the parents of a spontaneously aborted fetus sued the treating doctors and hospital. Susan Oswald, who was pregnant, experienced severe bleeding and cramping well ahead of her expected delivery date. Dr. Clark, one of the defendants, examined her and advised her there was nothing to be done and sent her home. The patient's husband became upset and demanded that his wife be admitted to the hospital. She was admitted, but her ensuing lack of care at the hospital resulted in this lawsuit. A nurse told her if the fetus miscarried it would not be a baby, only a "big blob of

blood." One of her treating doctors said, within her hearing, that he did not want to treat her. At one point, the mother screamed in pain and yelled that she was in labor. The doctor did not do a pelvic exam. He suspected, but did not inform the parents, that the mother had a uterine infection. The doctor told the father to calm down his wife, and approximately one-half hour before the doctor's shift ended, he left for vacation. The baby soon began to be born, without medical attention, until the father kicked on a door and got the attention of the medical staff. A one-pound baby girl was delivered, but a nurse announced she was stillborn. One of the doctors examined her for gender but made no further examination. The father called family members to tell them of their loss and, on returning to the room, discovered the baby grasped his finger. The baby, who had been kept on a surgical tray for half an hour, was rushed to a neonatal unit but died twelve hours later. *Oswald*, 453 N.W.2d at 636–37.

In *Oswald* the parents sued the medical care personnel and the hospital, but the district court granted summary judgment for the defendants. On appeal we held that some of the plaintiffs' claims, such as whether better care would have saved the baby's life, required expert testimony. The same was true on the question of whether the defendants' callous treatment of the mother added to her medical stress. *Id.* at 638. We held, however, that to establish emotional distress under these facts

> [n]o expert testimony is needed to elaborate on whether the statements by the nurses and Dr. Clark were rude and uncaring; a lay fact finder could easily evaluate the statements in light of the surrounding circumstances to determine whether the language used or message conveyed breached the standard of care expected of medical professionals, and

determine the harm, if any, resulting to the plaintiffs. . . .

> We are similarly convinced that a lay jury is also capable of evaluating the professional propriety of Dr. Clark's early departure from the hospital, knowing that he had left Susan Oswald unattended in a hospital corridor screaming hysterically that she was about to give birth.

*Id.* at 639–40.

*Oswald* relied on a similar New Jersey case, *Friel v. Vineland Obstetrical & Gynecological Professional Association*, 166 N.J.Super. 579, 584, 400 A.2d 147, 149 (Law Div.1979), which held a doctor's "utter lack of attendance" at critical stages of the delivery "would appear to be within the province of the jury. . . ."

*Oswald* bore a similarity to the present case also in that it relied in part on admissions of the defendant doctors to establish a breach of the duty of care. *Oswald*, 453 N.W.2d at 640. Here, Dr. Delbridge testified in his deposition that somebody made an error:

> Q. Do you agree that absent an error on somebody's part, Mr. Campbell should not have been reinfused? A. Mr. Campbell's desires were not to be reinfused; that was my intention, and *there was an error.*

(Emphasis added.)

While Dr. Delbridge concedes the plaintiff should not have been reinfused, he contends he did all he could do to convey the message to the PACU nurses not to do it. He contends he did not order a reinfusion and points to the patient's chart with its "no infusion" notations to defend the claims against him. The nurses, on the other hand, contend they did not get the message about not reinfusing the patient and that this was due in part to the fact that Dr. Delbridge had taken the chart,

with its no-infusion notations, with him to write in it. There was even evidence that there might have been a mix-up between Campbell's chart and that of another patient. The nurses also point to the fact that the doctor had ordered the use of a Gish, and this in itself suggests the doctor was ordering reinfusion. The nurses testified that, in the past, they had always reinfused patients when the doctor ordered a Gish to be used.

Whether reinfusion was called for, from a medical perspective, or whether the infusion was properly done would obviously require testimony by a medical expert. However, as in *Oswald*, we believe a lay fact finder is qualified and capable to resolve issues that are only peripheral to the medical decisions. In *Oswald*, for example, we said a fact finder could evaluate the propriety of a doctor's leaving his patient early to go on vacation. 453 N.W.2d at 640. Here, Dr. Delbridge contends he did all he could to convey his order not to infuse the patient. The hospital, through its nurses, contends no order was provided to them and further that Dr. Delbridge created an aura of confusion by ordering use of the Gish. These are issues of credibility and communication. These are not complex issues. As we have said:

> It is the complexity of professional negligence cases that requires expert testimony. [The defendant] argues that stray-voltage cases are technical in nature and thus require such testimony. Although testimony of witnesses having specialized education and training, or special experience and knowledge, is often admitted into evidence on the ground of necessity, it is not necessarily required merely because a case involves matters of science, special skill, special learning, knowledge, or experience which may be difficult for jurors to comprehend.

*Schlader v. Interstate Power Co.*, 591 N.W.2d 10, 14 (Iowa 1999). In *Schlader* we quoted from *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313, 317 (1962):

> [I]f all the primary facts can be accurately and intelligibly described to the jury, and if they, as [persons] of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation [expert testimony is not required].

*Schlader*, 591 N.W.2d at 14. The bases of the plaintiff's claims in this case are, like in *Oswald*, "that the care provided by defendants . . . fell below the standard of medical professionalism understood by laypersons and expected by them." *Oswald*, 453 N.W.2d at 638 (holding callous remarks by nurses and doctor's admitted failure to determine viability of the fetus were standards of care understood and expected by laypersons); *see also Estate of Long v. Broadlawns Med. Ctr.*, 656 N.W.2d 71, 83 (Iowa 2002). In *Long* a plaintiff alleged a psychiatric doctor negligently failed to notify the plaintiff's decedent, who had been murdered by the doctor's patient, that the murderer's release was imminent. The defendant in *Long* claimed that expert testimony was required to inform the jury on "the predictability and probability of the actions of a mental health patient." *Long*, 656 N.W.2d at 82. The trial court rejected the defendants' argument, and we affirmed on this rationale:

> We, like the district court, struggle to see how expert testimony was required in this case. The core negligence issue presented focused on whether Broadlawns fulfilled a promise to Jillene to notify her upon Gerald's discharge. A

consideration of the issues surrounding this alleged promise raised no real questions of a "scientific, technical, or other specialized" nature that would require testimony by an expert to "assist the trier of fact to understand the evidence or to determine a fact in issue." Iowa R. Evid. 5.702.

*Id.* at 83. We concluded that expert testimony on causation and the predictability and probability of the actions of a mental-health patient were not required to be demonstrated by expert testimony. *Id.*

The evidence concerning the lack of communication between the doctor and the PACU nurses, the possible mix-up in patient charts, and the doctor's admission of error are capable of being resolved by a fact finder without the testimony of experts. The court erred in concluding otherwise and granting summary judgment against the plaintiff on that basis.

## IV. *Emotional Distress Damages.*

■ The defendants contend the plaintiff's claims for emotional distress could not be established without the aid of an expert witness. The plaintiff saw a psychiatrist four times, and the psychiatrist referred Campbell to a counselor, a licensed social worker, who was employed by Covenant Clinic Psychiatry. The counselor's report concluded that "this [reinfusion] was an event that had occurred that was traumatizing and resulting in the rigid thought process, may be triggering a depression that needed to be addressed." While this statement did not amount to an opinion by a medical doctor based on a reasonable degree of medical certainty, as often is presented, this statement together with the plaintiff's testimony concerning the connection between the event and his later psychological problems present a sufficient factual dispute to avoid summary judgment.

■ The defendants also contend that the plaintiff can point to no accompanying physical injury to provide a basis for emotional-distress damages. *See Oswald,* 453 N.W.2d at 639 (noting general rule requiring physical injury). However,

[a]n exception exists ... where the nature of the relationship between the parties is such that there arises a duty to exercise ordinary care to avoid causing emotional harm.

*Id.* (citing *Niblo v. Parr Mfg., Inc.,* 445 N.W.2d 351, 354 (Iowa 1989)). We cited several cases involving recovery for "deeply emotional" events that did not require an accompanying physical injury and concluded:

Under the comparable circumstances demonstrated by this record, we think liability for emotional injury should attach to the delivery of medical services.

*Oswald,* 453 N.W.2d at 639. We believe the present case falls under the same rationale and that the plaintiff was not required to establish an accompanying physical injury.

## V. *Conclusion.*

Under our summary-judgment rules, "[t]he burden is upon the party moving for summary judgment to show [the] absence of any genuine issue of a material fact. All material properly before the court must be viewed in the light most favorable to the opposing party." *Oswald,* 453 N.W.2d at 635 (quoting *Daboll,* 222 N.W.2d at 731).

When we view the evidence in this record in the light most favorable to the plaintiff, we conclude there are disputed issues of fact that preclude entry of summary judgment. We therefore reverse and remand for trial.

**REVERSED AND REMANDED.**