36 A.3d 83

Jeanelle Antionette TONEY

v.

CHESTER COUNTY HOSPITAL, the Chester County Hospital Foundation, Inc., Maheep Goyal, M.D., East Marshall Street Radiology, the University of Pennsylvania d/b/a the University of Pennsylvania Health System a/k/a the Clinical Practices of the University of Pennsylvania a/k/a Hospital of the University of Pennsylvania, and the Trustees of the University of Pennsylvania.

Appeal of Chester County Hospital and Chester County Hospital Foundation, Inc.

Jeanelle Antionette Toney

v.

Chester County Hospital and the Chester County Hospital Foundation, Inc., Maheep Goyal, M.D., East Marshall Street Radiology and the University of Pennsylvania d/b/a the University of Pennsylvania Health System a/k/a the Clinical Practices of the University of Pennsylvania a/k/a Hospital of the University of Pennsylvania, and the Trustees of the University of Pennsylvania.

Appeal of Maheep Goyal, M.D., the University of Pennsylvania d/b/a the University of Pennsylvania Health System a/k/a the Clinical Practices of the University of Pennsylvania a/k/a Hospital of the University of Pennsylvania, and the Trustees of the University of Pennsylvania.

Supreme Court of Pennsylvania.

Argued March 10, 2010.

Decided Dec. 22, 2011.

Benjamin A. Post, Daniel Jay Rovner, Berwyn, Kristen JoAnn Loerch, Kristi Lynn Thomas, Philadelphia, Post & Post, L.L.C., Jessica Kelly Webb, for Chester County Hospital and the Chester County Hospital Foundation.

Robert B. Hoffman, Elizabeth Kreder McCoy, Eckert Seamans Cherin & Mellot, LLC, Harrisburg, for Appellant Amicus Curiae, Pennsylvania Medical Society.

Arthur B. Keppel, Charles A. Fitzpatrick, Rawle & Henderson, L.L.P., Philadelphia, for M. Goyal, MD; University of PA; Trustees of the University of PA.

Daniel Bencivenga, Stephen Edward Raynes, Philadelphia, Raynes McCarty, for Jeanelle Antionette Toney.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, JJ.

## ORDER

PER CURIAM.

**AND NOW,** this 22nd day of December, 2011, the Court being equally divided, the Order of the Superior Court is **AFFIRMED.**

Justice ORIE MELVIN did not participate in the consideration or decision of this case.

Justice BAER files an opinion in support of affirmance in which Justice TODD and McCAFFERY join.

Justice TODD files an opinion in support of affirmance.

Chief Justice CASTILLE files an opinion in support of reversal.

Justice SAYLOR files an opinion in support of reversal in which Justice EAKIN joins.

Justice BAER, in support of affirmance.

We granted review of this case to consider whether a cause of action for negligent infliction of emotional distress, hereinaf-

ter NIED, exists where the emotional distress results from a "negligent breach of a contractual or fiduciary duty," absent physical impact or injury. After review of the development of the tort of NIED under Pennsylvania law and that of our sister states, we conclude that it is appropriate to extend liability for the infliction of emotional distress to a limited species of cases. As more fully defined below, we would hold that NIED is not available in garden-variety "breach of contractual or fiduciary duty" cases, but only in those cases where there exists a special relationship where it is foreseeable that a breach of the relevant duty would result in emotional harm so extreme that a reasonable person should not be expected to endure the resulting distress.[1] We further conclude that recovery for NIED claims does not require a physical impact. Accordingly, we would affirm the result of the Superior Court's decision, which reversed the trial court's order sustaining the defendants' preliminary objections and dismissing the plaintiff's complaint with prejudice.

The parties do not dispute any factual issues relevant to our decision. All agree that the above-captioned defendants, here-

1. We recognize that the lower courts have used the phrase "contractual or fiduciary duty" as a term of art to describe this category of NIED cases. We find this nomenclature problematic as it uses an essential element of a negligence action, duty, as a designation for the limiting requirement of a distinct category of NIED claims. As will be extensively discussed herein, we initially required the tortfeasor to impact the victim physically to justify recovery for NIED ("impact rule"). Thereafter, the requirements to state a NIED claim expanded to allow the victim to be in close proximity of physical impact ("zone of impact liability"), and then to permit recovery if the victim personally witnessed a tortfeasor physically impact a close relative ("bystander liability"). These represent three distinct variations of NIED claims; the phrase "contractual or fiduciary duty" presents a potential fourth variation. As developed more fully in this opinion, we would hold that if an actor has a particular contractual or fiduciary relationship with a victim and it is foreseeable that the actor's carelessness could cause severe emotional harm to the victim, and that harm occurs, a cognizable tort arises which is, in short-form, referred to as a breach of a "contractual or fiduciary duty" not to inflict foreseeable emotional distress upon a victim. For purposes of this opinion, we will substitute the term "relationship" for "duty," where possible, in our description of the development of the cause of action, but will otherwise adhere to what we view as an imprecise description of this fourth category of NIED torts.

inafter Defendants, either directly or vicariously, performed a pelvic ultrasound study on Plaintiff Jeanelle Antionette Toney and her unborn child on March 3, 2003. Defendants interpreted and reported the results to Plaintiff as normal. On July 3, 2003, however, Plaintiff gave birth to her son who had several profound physical abnormalities.[2] Plaintiff, who was conscious during the birth, alleges that Defendants' negligent misinterpretation of the March 2003 ultrasound prevented her from preparing herself for the shock of witnessing her son's birth with such substantial physical deformities.

Plaintiff avers that she suffered emotional distress due to the shock, which manifested in, *inter alia*, nausea, headaches, insomnia, depression, nightmares, flashbacks, repeated hysterical attacks, stress, and anxiety. Equally important, Plaintiff does not allege that the misinterpretation of the ultrasound was, in any way, causally related to the deformities presented, nor did it alter or delay the treatment of the deformities. Instead, Plaintiff seeks remuneration solely for the emotional distress she claims she continues to suffer from witnessing the birth of her physically deformed son without prior knowledge of the deformities.

Plaintiff filed a medical malpractice action on June 29, 2005 in the Chester County Court of Common Pleas, alleging that the Defendants, as health care providers for Plaintiff and her child, had a duty to provide them with skilled and competent medical care, diagnosis, treatment, and attention. Plaintiff alleged that Defendants breached this duty when they negligently misinterpreted and misreported the ultrasound as normal, causing her to suffer emotional distress because they did not provide her with the "opportunity to brace herself for the shock [of witnessing her child's birth with profound abnormalities], without the benefit of seeking psychiatric, religious, or social counseling, [and] without the benefit of making appro-

2. The abnormalities include the absence of all four extremities below the elbow or knee joint, hypoglossia (short, incompletely developed tongue), micrognathia (abnormally small lower jaw), ventral curvature of the penis, and umbilical hernia.

priate arrangements prior to [her child's] birth." (Compl. at 11–12).

Defendants filed preliminary objections claiming that Plaintiff failed to state a claim for NIED, because, *inter alia,* Plaintiff's claim did not meet any of the established tests for NIED, such as the zone of danger or bystander theories of liability, discussed *infra,* and because Defendants' actions in no way caused the deformities suffered by Plaintiff's child.[3] Plaintiff responded by claiming that the Pennsylvania Superior Court in *Doe v. Philadelphia Community Health Alternatives AIDS Task Force,* 745 A.2d 25, 27 (Pa.Super.2000); *Armstrong v. Paoli Memorial Hospital,* 430 Pa.Super. 36, 633 A.2d 605 (Pa.Super.1993); and *Crivellaro v. Pennsylvania Power and Light Co.,* 341 Pa.Super. 173, 491 A.2d 207 (1985), recognized that NIED can be based upon a pre-existing fiduciary or contractual relationship, in addition to the more common zone of danger and bystander theories of NIED liability discussed in detail below.

The trial court dismissed Plaintiff's complaint on April 19, 2007.[4] Relying upon *Doe,* 745 A.2d at 27, the trial court stated that a claim of NIED requires one of the following four elements:

(1) that the Defendant had a contractual or fiduciary [relationship with Plaintiff]; (2) that Plaintiff suffered a physical impact; (3) that Plaintiff was in a "zone of danger" and at

3.  Although not relevant for purposes of this appeal, the record indicates that there are two groups of defendants, those related to the Chester County Hospital, and those related to the University of Pennsylvania, including Dr. Maheep Goyal, M.D., the radiologist who interpreted the ultrasound. The first group of defendants filed their preliminary objections in July, while the second group filed their objections in September 2005. No dispute has been raised to this Court regarding the timing of these filings.

4.  Apparently, an original order dismissing the complaint was filed in March 2006, but it did not dispose of one of the defendants, East Marshall Street Radiology. Accordingly, the Superior Court *sua sponte* quashed Plaintiff's original notice of appeal. Therefore, Plaintiff filed a motion with the trial court to discontinue the action against East Marshall. On April 19, 2007, the trial court granted Plaintiff's motion to discontinue against East Marshall, dismissed that defendant, and incorporated the March 2007 order dismissing the other defendants.

risk of an immediate physical injury; or (4) that Plaintiff had a contemporaneous perception of tortious injury to a close relative.

Tr. Ct. Slip Op. at 3. The court added that Plaintiff must also prove bodily harm resulting from the emotional distress. The trial court observed that the first category of NIED, involving a preexisting fiduciary or contractual relationship, has only been recognized in two Pennsylvania appellate court cases. The court first reviewed *Crivellaro*, in which a plaintiff claimed that she was wrongly subjected to thirty-three days of an intensive and abusive alcohol and drug detoxification program on threat of termination from her employer. Crivellaro claimed that she suffered physical symptoms resulting from emotional distress allegedly caused by the negligent operation of the detoxification program that the defendant-employer ordered her to attend. The trial court in the case at bar noted that the Superior Court in *Crivellaro* found that the plaintiff had sufficiently alleged a duty, a breach, and a causal connection between the alleged breach and the plaintiff's injuries, and reversed the prior order sustaining the preliminary objections in the nature of a demurrer.

The trial court *sub judice* also reviewed *Armstrong*, 633 A.2d 605, which involved a defendant-hospital that informed a plaintiff that her husband had been in a severe accident. The plaintiff suffered emotional distress when it was revealed that her husband was not involved in the crash. The Superior Court concluded that the hospital was not liable, in part, because the hospital did not owe the plaintiff a pre-existing duty of care because neither she nor her husband was a patient. Without the pre-existing duty, no liability existed according to the court in *Armstrong*.

Applying this law to the case at bar, the trial court noted that NIED liability was viable in this case only under the fiduciary or contractual relationship theory of NIED liability, because Plaintiff did not allege facts that would bring her claim within the traditional physical impact, zone of danger, or bystander theories of NIED liability. The court acknowledged Plaintiff's argument that a doctor-patient relationship

existed, but disagreed with Plaintiff that she suffered physical symptoms as a result of Defendants' misreading of the ultrasound. Instead, the court found that the emotional distress suffered by Plaintiff was due to her child's deformities, which she did not allege were the results of Defendants' negligence.[5]

Plaintiff filed a notice of appeal with the Superior Court in May 2007. The Superior Court, in a six to two *en banc* published opinion, reversed the trial court's grant of preliminary objections and remanded the case to the trial court for further proceedings.[6] *Toney v. Chester County Hosp.*, 961 A.2d 192 (Pa.Super.2008) (*en banc*). The majority concluded that Plaintiff had pled a cause of action for NIED. The Superior Court cited *Doe*, 745 A.2d 25, for the four potential theories of NIED liability, including the cause of action based upon a pre-existing fiduciary or contractual relationship. The court concluded that Plaintiff satisfied the requirement of demonstrating that Defendants owed her a duty because she averred that she was a patient of Defendants, which created a pre-existing duty of care pursuant to the doctor-patient relationship.

Next, the Superior Court considered whether Plaintiff had established that the Defendants' breach of their duty of care resulted in physical injury to Plaintiff that was reasonably foreseeable. Again, the Majority held that Plaintiff properly pled that her injuries were a foreseeable result of a breach of the duty of care owed by a medical provider to a patient. The court concluded that "[it is] entirely foreseeable that under the circumstances as alleged, [Plaintiff] would suffer traumatic emotional distress during the birth of her son." *Id.* at 199. Relying on prior Superior Court caselaw, the court also concluded that Plaintiff could meet the physical injury element of

5. The trial court also addressed and rejected Plaintiff's claim of intentional infliction of emotional distress, which will not be discussed in this opinion.

6. Judge Panella authored the majority decision, joined by Judges Ford Elliott, Stevens, Musmanno, Bender, and Gantman. Now–Justice Orie Melvin wrote in dissent, joined by Former–Judge Lally–Green. Now–Justice Todd did not participate in the decision of the Superior Court, although she was listed on the Superior Court panel.

NIED without demonstrating physical impact, so long as the emotional distress caused physical symptoms, as Plaintiff averred in this case. The court, therefore, concluded that the trial court erred in dismissing the complaint for failure to state a cause of action.

Now–Justice Orie Melvin filed a concurring and dissenting opinion, dissenting to the aspect of the majority's decision that is before this Court and concluding that Plaintiff failed to present a cause of action for NIED. The dissent relied upon the prior Superior Court decision in *Brown v. Philadelphia College of Osteopathic Medicine,* 760 A.2d 863 (Pa.Super.2000), where plaintiffs won a jury verdict for NIED based upon the erroneous report of a newborn's positive test for syphilis, which allegedly resulted in emotional distress for the mother and the breakdown of her marriage. The Superior Court in *Brown* remanded to the trial court for entry of judgment notwithstanding the jury's verdict, concluding that the erroneous syphilis report was not a substantial factor causing the harm suffered by the plaintiffs. Similarly, in the case at bar, the dissent opined that Plaintiff failed "to establish that [the Defendants'] conduct was a substantial factor in causing her emotional distress." *Toney,* 961 A.2d at 205 (Orie Melvin, J., dissenting). The dissent stated that Plaintiff's "claim for emotional distress is premised solely upon her shock at observing her newborn son's significant physical disabilities at the time of his birth, rather than resting upon anything [Defendants] did or failed to do some four months prior." *Id.* Accordingly, the dissent concluded that Plaintiff failed to state a claim.

Both the Chester County Hospital defendants and the University of Pennsylvania defendants filed petitions for allowance of appeal.[7] We granted the petitions and rephrased the issue for clarity as follows: "Whether the Superior Court erred in finding a cause of action for [NIED] exists where

7. The Chester County Hospital defendants and the University of Pennsylvania defendants have filed separate sets of briefs. We will combine our discussion of the briefs because the arguments raised by both groups substantially overlap.

emotional distress results from the negligent breach of a contractual or fiduciary duty, absent a physical impact or injury?" *Toney v. Chester County Hosp.*, 601 Pa. 388, 973 A.2d 415 (2009) (*per curiam*). Defendants acknowledge that the phrasing of our question for review involves two separate issues: the first is whether an NIED claim can be sustained based on a contractual or fiduciary relationship, and the second is whether a physical impact is required for this type of NIED claim.

Before considering the specific issues presented in this appeal, we must first review the development of our law regarding NIED. Before 1970, our Court abided by the century-old common law "impact rule" in cases involving emotional distress claims. The impact rule "barred recovery for fright, nervous shock or mental or emotional distress unless it was accompanied by a physical injury or impact upon the complaining party." *Kazatsky v. King David Memorial Park, Inc.*, 515 Pa. 183, 527 A.2d 988, 992 (1987); *see also, Potere v. City of Philadelphia*, 380 Pa. 581, 112 A.2d 100, 104 (1955). We acknowledged that the "common law rationale for the impact rule is embodied in the often-quoted statement of Lord Wensleydale in *Lynch v. Knight*, 9 H.L.Cas. 557, 598, 11 Eng.Rpts. 854, 863 (1861): 'Mental pain or anxiety the law cannot value, and does not [pretend to] redress, when the unlawful act complained of causes that alone.' " *Id.; see also,* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts,* § 12, at 55 (5th ed.1984). In *Kazatsky*, we further catalogued the concerns regarding recovery for psychic injury as including "medical science's difficulty in proving causation, the danger of fraudulent or exaggerated claims, and the perception that recognition of such a cause of action would precipitate a flood of litigation." *Id.*

We did not diverge from the impact rule until *Niederman v. Brodsky*, 436 Pa. 401, 261 A.2d 84 (1970), when we adopted the "zone of danger" theory of NIED liability, which provided compensation to those who did not actually suffer a physical impact resulting in emotional distress so long as they were in personal danger of the physical impact. We concluded that

the fear of impact resulted in justifiable and compensable emotional distress. The Court in *Niederman* allowed this extension of liability, in part, based upon the evolution of medical science's ability to diagnose mental distress. *Id.* at 86.

The most recent step in the evolution of NIED occurred in *Sinn v. Burd*, 486 Pa. 146, 404 A.2d 672 (1979), where we adopted the theory of bystander liability. The adoption of the bystander liability theory of NIED allowed recovery for emotional distress for plaintiffs who witnessed an accident causing serious injury to a close family member, even if the plaintiff was not within the zone of danger of physical impact. As explained in *Sinn*, we limited recovery for serious mental distress to situations "where a reasonable person normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the event." *Id.* at 683 (internal quotations marks omitted). The University of Pennsylvania Defendants observe that in *Sinn* this Court expanded liability "with the utmost respect for the concerns it had addressed in *Niederman,* including ... the need for a procedural construct that would lend a measure of assurance of authenticity (foreseeability) to the claims being permitted to go forward." Brief of University of Pennsylvania Defendants at 18. Later, in *Mazzagatti v. Everingham*, 512 Pa. 266, 516 A.2d 672 (1986), we refused to extend bystander liability where a plaintiff did not immediately witness the traumatic event, but instead came upon the scene later.

In this case, Defendants accuse the Superior Court of creating a new category of NIED based upon a preexisting fiduciary or contractual relationship. They argue against the new category of NIED liability and the Superior Court's failure to adhere to our prior requirement of a physical impact, which is present to some degree in each of the previously adopted theories of NIED liability.[8] We address these two issues separately.

8. Physical impact is obviously an element of impact rule NIED claims. Likewise, zone of danger cases require a plaintiff to have been in

## A. NIED Based Upon Special Relationships.

Defendants argue that the Superior Court's holding in this case diverges from the stringent limitations that this Court has established for NIED claims and expands the tort of NIED to impose liability any time any duty is breached and emotional distress is experienced. Indeed, Defendants suggest that affirming the Superior Court would sanction recovery for plaintiffs who suffer health conditions that are not preventable by medical intervention or caused by the alleged negligence of medical professionals, but are merely unfortunate events, as they assert occurred in this case. They emphasize that "[t]he law is not the guarantor of an emotionally peaceful life. Tort law cannot protect any of us from the emotional slings and arrows of daily living." Brief of University of Pennsylvania Defendants at 45 (quoting *Armstrong*, 633 A.2d at 615).

While Defendants emphasize that our Court has never endorsed this type of NIED claim, they acknowledge that some of the Superior Court's prior caselaw references pre-existing relationships as a potential basis for NIED liability. Defendants, however, contend that the language relied upon has merely been quoted from prior Superior Court or trial court opinions that did not thoroughly or properly address the issue, or involved cases where the court did not grant relief due to other failings, such as the absence of a physical impact, making the relied upon language *dicta*.

Defendants observe that our Court has limited recovery for emotional distress due to the difficulty of proving its causation, the fear of fraudulent claims, and the concern for a flood of litigation. They argue that allowance of recovery in this case triggers these concerns. First, according to Defendants, there is no scientific way to measure the increased emotional distress resulting from Plaintiff not being prepared for seeing the deformity of her child, in contrast to the emotional distress that she would have suffered at the time of the ultrasound if she had been informed of the deformity in addition to the

personal danger of a physical impact. Finally, bystander liability NIED requires that a close relative suffer a physical impact.

distress she would have suffered upon seeing the child's deformities at birth, even if she had been properly informed. Defendants also allege that there will be a flood of litigation alleging emotional distress due to medical testing errors that do not result in physical harm, potentially including claims resulting from a mother being told that she will have a boy, and then unexpectedly having a girl. Recovery in such a hypothetical case or the case at bar, according to Defendants, would allow for liability without causation, as nothing the actors did, or failed to do, caused the newborn's gender or the deformities suffered by Plaintiff's son in the instant case.

In contrast, Plaintiff asserts that the Superior Court's decision herein is an "integration and application of more than three decades of Pennsylvania jurisprudence" relating to NIED, beginning with the Superior Court's decision in *Crivellaro*, discussed above. Brief of Plaintiff at 4. Plaintiff justifies the adoption of a preexisting fiduciary or contractual relationship NIED cause of action based upon Section 436(1) of the Restatement (Second) of Torts.[9] Although she incorrectly suggests that this Court adopted this subsection in *Niederman*, she accurately observes that we did adopt the other two subsections of Section 436 addressing the two other exceptions to the impact rule: the zone of danger and bystander liability theories of NIED. She argues that the preexisting relationship theory of NIED, like the other two exceptions, has a built-in limitation to protect against the threat of limitless liability and

9.  § 436. Physical Harm Resulting From Emotional Disturbance
    (1) If the actor's conduct is negligent as violating a duty of care designed to protect another from a fright or other emotional disturbance which the actor should recognize as involving an unreasonable risk of bodily harm, the fact that the harm results solely through the internal operation of the fright or other emotional disturbance does not protect the actor from liability.
    (2) If the actor's conduct is negligent as creating an unreasonable risk of causing bodily harm to another otherwise than by subjecting him to fright, shock, or other similar and immediate emotional disturbance, the fact that such harm results solely from the internal operation of fright or other emotional disturbance does not protect the actor from liability.
    (3) The rule stated in Subsection (2) applies where the bodily harm to the other results from his shock or fright at harm or peril to a member of his immediate family occurring in his presence.

the flood of litigation that have been cited as factors support-
ing the maintenance of the impact rule. Plaintiff claims that a
pre-existing relationship NIED claim under § 436(1) of the
Restatement is limited based upon the specific duty owed by
the defendant. Plaintiff argues that an injured party must
demonstrate that the defendant breached a duty owed to the
plaintiff "to protect another from a fright or other emotional
disturbance which the actor should recognize as involving an
unreasonable risk of bodily harm." Restatement (Second) of
Torts § 436(1). She emphasizes that the comments to the
Restatement limit this theory of recovery to rare cases involv-
ing a defendant who owes a duty of care to protect another
from fright and emotional distress, where the fright or emo-
tional disturbance is likely, or in other words, foreseeable.

She claims that the Defendants owe a duty of care to
Plaintiff to protect her from fright or emotional disturbance
caused by misreading the ultrasound, which Defendants
should have recognized involved an unreasonable risk of harm
to Plaintiff. She asserts that the purpose of an ultrasound is
for the parent to know the health of the unborn baby in
advance so that, *inter alia,* the parents can arrange to buffer
themselves for the shock of witnessing birth anomalies.
Therefore, she attempts to distinguish radiologists interpret-
ing ultrasounds from any other doctor or professional, appar-
ently based on the concept that those involved in prenatal
testing have a duty to protect soon-to-be parents from shock
that other doctors or professionals do not have. She argues
that we need not fear the floodgates of litigation because this
NIED theory of liability has existed since *Crivellaro* without
dire consequences, and urges our official adoption of the
theory of liability and affirmance of the Superior Court.

We agree with Defendants that the Superior Court's devel-
opment of the theory of NIED liability based on a preexisting
fiduciary or contractual relationship is flawed in that no
decision has fully considered or officially adopted the theory,
despite repeated citations to it. Accordingly, we must deter-
mine whether NIED liability should be extended to such
cases.

In the past, our Court has addressed the problem of determining which emotional distress claims are compensable and which are not by setting standards to determine the veracity of the emotional distress and to limit the potential number of plaintiffs. For example, when a child is severely injured in a car accident, there is no question that the child may suffer from emotional distress, and we allow for such a claim under the impact theory. Likewise, under the zone of danger theory of NIED liability, we have recognized that others who are almost injured by the same car accident may also suffer real and compensable emotional distress even if they are not physically struck. Similarly, it is beyond cavil that parents who witness the severe injury to their child in this hypothetical accident also suffer genuine emotional distress, as acknowledged by the bystander theory of liability. However, parents who do not witness the accident will also suffer emotional distress when they learn of their child's injuries, as will family friends, teachers, and neighbors; yet we have decided that such emotional distress is not compensable, in part because we must draw lines to prevent unlimited liability to an unlimited number of plaintiffs, notwithstanding the commission of negligent acts.

Here, we are faced with the undeniable truth that some negligent breaches of duties in preexisting relationships will give rise to severe emotional distress that should be compensable, as evidenced in the following discussion of cases where our sister courts have accepted this theory of liability. However, equally true, is the fact that not all breaches of duties should result in compensable emotional distress claims. As noted by one recent commentator,

> The contrast between garden-variety commercial and consumer transactions where breach of duty does not give rise to claims for freestanding emotional distress and those cases where breach of duty does give rise to such claims has something else instructive to tell us, namely, that there must be something special about the emotional distress in those cases where we do permit recovery. In those cases, emotional stress and distress are not the just costs of living

in our high-pressure world, a world where some more-than-exasperating glitches and affronts must be expected, borne, and shrugged off. In the cases that recognize liability, the distress must be something that we aren't expected to step up to the plate and just shoulder. The emotional distress at issue must be a significant kind of harm.

Gregory C. Keating, *Is Negligent Infliction of Emotional Distress a Freestanding Tort?*, 44 Wake Forest L.Rev. 1131, 1168–69 (2009).

Similarly, Professor Dan B. Dobbs observes that courts have limited the preexisting duty theory of liability to certain categories of special relationships. *See The Law of Torts*, § 312 (2000). He acknowledges that while childbirth cases are one of the prominent examples of a preexisting duty NIED claim, the claim can also be supported in other cases when "the defendant assumes a duty by contract, or otherwise and when the duty encompasses the plaintiff's emotional well-being." *Id.* at 849. In these special relationship cases, "[l]iability turns solely on relationships accepted by the defendant, usually under a contractual arrangement. Consequently, the duty extends only to those for whom the contract was made. When the defendant contracts to provide services for childbirth, he is on notice that negligent acts will likely cause emotional harm." *Id.* Dobbs suggest that this type NIED liability could also extend to relationships involving psychologists, mortuaries, and other situations where the defendants are aware that their assumed duty impliedly includes a duty to care for the emotional well-being of the plaintiff.

With that background in mind, we consider the jurisprudence of other states that have adopted a theory of NIED liability based upon special relationships. These courts have recognized certain categories of relationships as being amenable to the imposition of liability for emotional distress, such as the relationship between the loved ones of the deceased and those responsible for caring for the corpse. *See Menorah Chapels at Millburn v. Needle*, 386 N.J.Super. 100, 899 A.2d 316, 324 (2006) (holding that a breach of a funeral-services contract can support a claim for consequential damages);

*Perry–Rogers v. Obasaju*, 282 A.D.2d 231, 723 N.Y.S.2d 28, 29 (N.Y.App.Div.2001) ("Damages for emotional harm can be recovered even in the absence of physical injury 'when there is a duty owed by defendant to plaintiff, [and a] breach of that duty result[s] directly in emotional harm.'" (quoting *Kennedy v. McKesson Co.*, 58 N.Y.2d 500, 462 N.Y.S.2d 421, 448 N.E.2d 1332, 1334 (1983))). In Texas, courts "generally do not recognize a legal duty to avoid negligently inflicting mental anguish[,]" however the Supreme Court of Texas concluded that "mental anguish damages may be compensable when they are a foreseeable result of a breach of a duty arising out of certain special relationships, including a very limited number of contracts dealing with intensely emotional noncommercial subjects such as preparing a corpse for burial." *Freeman v. Harris County*, 183 S.W.3d 885, 890 (Tex.Ct.App.2006) (internal citations and quotation marks omitted).

In addition to relationships related to burial, another category of special relationship often considered in NIED cases is the doctor-patient relationship, as in the case at bar. Doctors clearly have a preexisting duty to their patients as evidenced in the volumes of malpractice cases that rest on the concept of the physician's duty of care. Additionally, doctors inevitably but necessarily inflict emotional pain on their patients when they disclose distressing news about the patient's health. Obviously, however, physicians should not be liable for the emotional distress when they are obligated to share distressing news. The question then becomes whether doctors are responsible for the emotional distress caused if they negligently divulge incorrect, emotionally disturbing information. Several cases have arisen where a medical professional's negligence has resulted in emotional distress, but no medical malpractice claim arises due to the absence of physical harm. For example, in *Perry–Rogers v. Obasaju*, 282 A.D.2d 231, 723 N.Y.S.2d 28, 29 (N.Y.App.Div.2001), a New York couple sought emotional distress damages when a fertility clinic negligently implanted the plaintiffs' embryo in another woman. Although neither plaintiff was physically injured by the implantation in another person, both nonetheless suffered emotional injury

due to the defendants' breach of their duty of care. The New York court framed the analysis as follows:

> Here, it was foreseeable that the information that defendants had mistakenly implanted plaintiffs' embryos in a person whom they would not identify, which information was not conveyed until after such person had become pregnant, would cause plaintiffs emotional distress over the possibility that the child that they wanted so desperately, as evidenced by their undertaking the rigors of *in vitro* fertilization, might be born to someone else and that they might never know his or her fate. These circumstances, together with plaintiffs' medical affidavits attesting to objective manifestations of their emotional trauma, create a "guarantee of genuineness" that makes plaintiffs' claim for emotional distress viable.

*Perry–Rogers*, 723 N.Y.S.2d at 29–30.

Courts that have accepted this theory of NIED liability have developed tests to distinguish which types of relationships justify its imposition. Texas courts have observed that "[s]pecial relationship cases generally have three common elements: (1) a contractual relationship between the parties, (2) a particular susceptibility to emotional distress on the part of the plaintiff, and (3) the defendant's knowledge of the plaintiff's particular susceptibility to the emotional distress, based on the circumstances." *Freeman*, 183 S.W.3d at 890.

Similarly, the courts in Iowa have concluded that certain relationships involve the risk of emotional harm justifying liability:

> An exception exists, however, where the nature of the relationship between the parties is such that there arises a duty to exercise ordinary care to avoid causing emotional harm. Such claims have been recognized in the negligent performance of contractual services that carry with them deeply emotional responses in the event of breach as, for example, in the transmission and delivery of telegrams announcing the death of a close relative and services incident to a funeral and burial. Under the comparable circum-

stances demonstrated by this record, we think liability for emotional injury should attach to the delivery of medical services. As we observed . . ., the birth of a child involves a matter of life and death evoking such mental concern and solicitude that the breach of a contract incident thereto will inevitably result in mental anguish, pain and suffering.

*Oswald v. LeGrand*, 453 N.W.2d 634, 639 (Iowa 1990) (internal citations and quotations marks omitted); *see also Campbell v. Delbridge*, 670 N.W.2d 108, 113 (Iowa 2003).

Likewise, in Wyoming, courts had limited emotional distress recovery in negligence cases to those involving physical injury, exposure to physical harm, or willful, wanton or malicious conduct. *See Larsen v. Banner Health Sys.*, 81 P.3d 196, 200 (Wyo.2003). In 2003, however, the Wyoming Supreme Court reconsidered these restrictions in a case where a daughter had been switched in the hospital at birth, raised in a non-biological family, and then subjected to ridicule from a father who did not accept her as his own due to her different physical appearance. In that case, it was clear that the daughter suffered real emotional distress despite the lack of any physical impact. Collecting cases from various jurisdictions, the court adopted the following test, relying upon Iowa caselaw:

We prefer Iowa's application of the independent duty exception because this expression is narrowly tailored and well reasoned. Under this exception recovery exists only in circumstances involving contractual services that carry with them deeply emotional responses in the event of breach. There must be a close nexus between the negligent action at issue and extremely emotional circumstances. Whether this exception should be applied in Wyoming requires that we determine whether to extend a limited duty of care to those who suffer mental distress in the above-mentioned limited circumstances. In making this determination we seek to balance the view that a negligent act should have some end to its legal consequences against the view that the injured party has the right to recover for all harm caused. Key policy factors to be considered are:

(1) the foreseeability of harm to the plaintiff, (2) the closeness of the connection between the defendant's conduct and the injury suffered, (3) the degree of certainty that the plaintiff suffered injury, (4) the moral blame attached to the defendant's conduct, (5) the policy of preventing future harm, (6) the extent of the burden upon the defendant, (7) the consequences to the community and the court system, and (8) the availability, cost and prevalence of insurance for the risk involved.

*Id.* at 203 (internal citations omitted).

The Wyoming court further found the new cause of action sufficiently limited by the requirement that there be a preexisting "relationship for services that carries with it deeply emotional responses in the event of a breach" and a "requirement that the distress inflicted be so severe that no reasonable man could be expected to endure it." *Id.* at 205 (internal quotations omitted). "It is for the court to determine whether on the evidence severe emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed." *Id.* at 206. The court similarly noted that the tort will not involve every medical relationship: "Although some level of emotion attends every situation involving one's health, we do not anticipate that every area of healthcare will carry the deeply emotional responses sufficient to sustain this exception." *Id.*[10]

After considering the arguments of the parties and the analysis of other states, we conclude that justification exists to extend NIED liability to a subset of cases involving preexisting relationships. In so doing, we consider the standard elements of negligence claims: duty, breach, causation, and

10. The court in *Larsen* additionally observed that both Oregon and Alaska recognize a cause of action for emotional distress in cases involving a preexisting duty where it is foreseeable that emotional harm could result from a breach of that duty. *Chizmar v. Mackie,* 896 P.2d 196, 203–04 (Alaska 1995) (requiring the contract to be highly personal and laden with emotion and the emotional injury be serious or severe); *Simons v. Beard,* 188 Or.App. 370, 72 P.3d 96, 102 (2003) (allowing recovery "if the defendant care provider breached 'a specific duty to be aware of and guard against particular adverse psychological reactions or consequences to medical procedures.' ").

damages.  *See* The Law of Torts, § 114, at 269–71.  Our conclusion in this section of the opinion relates to the element of duty and breach, while the next section of the opinion, involving the question of the necessity of physical impact, relates to causation and damages.

As with other states, we find it prudent to limit the reach of this NIED claim to preexisting relationships involving duties that obviously and objectively hold the potential of deep emotional harm in the event of breach.  As explained by these states, the special relationships must encompass an implied duty to care for the plaintiff's emotional well-being.  The potential emotional harm must not be the type that a reasonable person is expected to bear.  Compensable emotional harm has been described as "likely to be experienced as a visceral and devastating assault on the self" such that it "resemble[s] physical agony in its brutality."  Keating, 44 Wake Forest L.Rev. at 1174.  We agree with our sister courts that relationships involving life and death fall within this category.  It is impossible, and indeed would be irresponsible on our part, to create an exhaustive list of qualifying relationships in this opinion.  Rather, we find it prudent to leave the legal question of whether a sufficient duty exists to our trial judges to decide on a case-by-case basis, at some point prior to trial, be it preliminary objections, summary judgment, or the like.[11]  Nonetheless, we would hold that some relationships, including some doctor-patient relationships, will involve an implied duty to care for the plaintiff's emotional well-being that, if breached, has the potential to cause emotional distress resulting in physical harm.  In this case, involving the very

11.  In deciding whether imposition of a duty is appropriate, our trial courts should also consider the standard five-factor test we have utilized previously:

> The determination of whether a duty exists in a particular case involves the weighing of several discrete factors which include:  (1) the relationship between the parties;  (2) the social utility of the actor's conduct;  (3) the nature of the risk imposed and foreseeability of the harm incurred;  (4) the consequences of imposing a duty upon the actor;  and (5) the overall public interest in the proposed solution.
> *Bilt–Rite Contractors, Inc. v. The Architectural Studio,* 581 Pa. 454, 866 A.2d 270, 281 (2005).

sensitive and emotionally charged field of obstetrics, we conclude that Defendants had such an implied duty to care for Plaintiff's emotional well-being.

To be compensable, the breach of this implied duty to care for the plaintiff's emotional well-being must result in severe emotional distress, as described above. In this case, Plaintiff has alleged that Defendants breached their duty by failing to interpret her ultrasound properly, which prevented her from having the "opportunity to brace herself for the shock [of witnessing her child's birth with profound abnormalities], without the benefit of seeking psychiatric, religious, or social counseling, [and] without the benefit of making appropriate arrangements prior to [her child's] birth." (Compl. at 11–12). We conclude that this assertion is sufficient to protect her from dismissal on preliminary objections on the question of breach of Defendant's implied duty to care for the plaintiff's emotional well-being.[12]

As we would accept the theory of a special relationship NIED liability based upon an implied duty to care for the plaintiff's emotional well-being, we must next consider whether recovery requires demonstration of a physical impact as part of the causation element of the tort.

## B. *Necessity of Physical Impact*

Defendants assert that this Court has carefully restricted NIED recovery to situations involving negligent acts resulting in physical impact on the plaintiff (or danger thereof) or physical impact on a close relative of the plaintiff, however slight. Defendants emphasize that one of the underlying reasons for this Court's requirement of a physical impact is the perceived need to address the ethereal nature of emotional distress claims and the difficulties in disproving the existence of emotional injuries and disproving a causal connection between the alleged emotional distress and the alleged negligence. Defendants note that we have stated, "there can be no recovery of damages for injuries resulting from fright or

12. Nonetheless, we take the opportunity to note that not all improper interpretations of test results will result in a viable claim for NIED.

nervous shock or mental or emotional disturbances or distress unless they are accompanied by physical injury or physical impact." *Simmons v. Pacor, Inc.*, 543 Pa. 664, 674 A.2d 232, 238 (1996). They argue that the case at bar represents a dramatic break from this precedent by allowing Plaintiff to recover absent any physical impact on either Plaintiff or her child, in effect creating a new impact-free theory of recovery.

Defendants observe that this case could have been framed as a medical malpractice claim if the deformities had resulted from the misinterpretation. Defendants note, however, that Plaintiff does not and cannot allege that the deformities resulted from the misinterpretation of the ultrasound or that the misinterpretation changed or delayed the treatment of the deformities in any way. They claim that allowing NIED recovery in this case would allow plaintiffs to "no longer have to allege and prove that their physician's negligence caused their health condition, or that the ultimate outcome would have been different had their physician not been negligent. Rather, plaintiffs can merely claim that their physician's negligence caused them mental distress." Brief of Chester County Hospital Defendants at 22–23. Accordingly, Defendants argue that permitting this cause of action absent physical impact will increase the cost of medical care because healthcare providers will have to defend against this new class of lawsuits.

Addressing the issue of physical impact, Plaintiff acknowledges Pennsylvania's history of requiring physical impact in NIED cases, but emphasizes the steady move away from the requirement as evidenced by the adoption of the zone of danger and bystander liability theories of NIED. She notes that the Court in *Niederman* moved away from the impact rule in accepting the zone of danger rule because it was compelled to do so by the "inherent humanitarianism of our judicial process." *Niederman*, 261 A.2d at 85. In so doing, according to Plaintiff, our Court rejected the arguments that the absence of a physical impact requirement would result in a flood of litigation, incalculable damages, and fraud. Instead, the *Niederman* Court held that "[t]he best statement of the

rule is that a wrong-doer is responsible for the natural and proximate consequences of his misconduct." *Id.*

Moreover, Plaintiff asserts that the impact rule has proven unworkable. Citing to scholarly criticism of the impact rule as creating absurd results, *see Prosser and Keeton on Torts,* § 54, at 362–64, she claims that Pennsylvania witnessed the absurdity of the impact rule in *Stoddard v. Davidson,* 355 Pa.Super. 262, 513 A.2d 419, 422 (1986), where the Superior Court found a "physical impact" in the jolt that occurred when a plaintiff's automobile ran over a corpse that was negligently left in the road, and the plaintiff suffered emotional distress as a result. Few would argue that the "jolt," in and of itself, caused the emotional distress, but the court so held to justify the plaintiff's recovery consonant with the rule requiring physical impact. Similarly, she suggests that the Superior Court in *Brown v. Philadelphia College of Osteopathic Medicine,* 449 Pa.Super. 667, 674 A.2d 1130, 1134 (1996), strained to uphold a plaintiff's verdict on her NIED claim based upon an impact rule analysis, where the impact was slight. In that case, a mother suffered undisputed emotional distress when she was left unattended in an emergency room for over an hour while delivering a stillborn infant. The Superior Court, however, cited the "impact" of a nurse placing the body of the infant in the plaintiff's arms as the justification for the NIED claim. Plaintiff argues that the NIED claim should have been viable based upon the undisputed negligence and emotional distress suffered, regardless of the minor physical impact.

She contends that, like the zone of danger and bystander-based NIED claims, pre-existing relationship based NIED claims have a built-in limitation on liability, such that the claim need not be limited only to cases involving physical impact. She argues that a pre-existing relationship NIED cause of action would only arise where the actor has a duty to protect another from fright or emotional disturbance and where the actor should recognize that a breach of the duty involves an unreasonable risk of bodily harm. Thus, the tort would be limited to rare cases, according to Plaintiff, "in which the actor's conduct is intended or obviously likely to cause severe

fright or other emotional disturbance, although it is not intended to cause the bodily harm which results from it." Brief of Plaintiff at 21 (quoting Restatement (Second) of Torts, § 436(1), Comment).

As Defendants correctly report, our caselaw has repeatedly stated a requirement that a plaintiff must demonstrate physical impact to recover under the tort of NIED. *See Simmons*, 674 A.2d at 238 ("It is the general rule of this Commonwealth that there can be no recovery of damages for injuries resulting from fright or nervous shock or mental or emotional disturbances or distress unless they are accompanied by physical injury or physical impact."); *Hunger v. Grand Cent. Sanitation*, 447 Pa.Super. 575, 670 A.2d 173, 178 (1996) ("A plaintiff cannot recover for emotional upset where there is no physical impact involved in the case at all."). This oft-stated requirement has been justified upon the understandable need to differentiate true emotional disturbance that deserves relief from false or trivial claims of emotional disturbance, based upon the idea that physical impact legitimizes the claims of the plaintiff and helps to prove causation. Courts have long been concerned with how to distinguish the genuine claims from the trivial or fraudulent claims, to prevent defendants from becoming insurers of society's emotional tranquility. Dean Keeton noted,

There are at least three principal concerns, however, that continue to foster judicial caution and doctrinal limitations on recovery for emotional distress: (1) the problem of permitting legal redress for harm that is often temporary and relatively trivial; (2) the danger that claims of mental harm will be falsified or imagined; and (3) the perceived unfairness of imposing heavy and disproportionate financial burdens upon a defendant, whose conduct was only negligent, for consequences which appear remote from the 'wrongful' act."

*Prosser and Keeton on the Law of Torts*, § 54 at 360–61.

Equally true, however, is that in the past forty years, this Court has created exceptions to the impact requirement where facts and human experience necessitate it. First, in *Nieder-*

*man,* the Court recognized that individuals may suffer equal emotional injuries when faced with a near-miss as with an actual collision. Similarly, in *Sinn,* the Court correctly acknowledged that it is a fact of human experience that parents or other close relatives may suffer equal if not substantially greater emotional pain when watching a child or loved one seriously injured than when they suffer or fear a similar injury to themselves. Likewise, as discussed in the previous section of this opinion, our sister courts have created exceptions to the impact rule, in cases involving special relationships where one can assume the legitimacy of the emotional pain experienced without also requiring that a plaintiff be hit with an object.

Moreover, as discussed above in Pennsylvania cases, legal scholars have long noted the ridiculous lengths to which courts have stretched to justify a reward through a demonstration of physical impact. Dean Keeton observed that courts relied upon the impact rule to afford "the desired guarantee that the mental disturbance is genuine. But the same courts have found 'impact' in minor contacts with the person which often play no part in causing the real harm, and in themselves can have no importance whatever." *Prosser and Keeton on the Law of Torts,* § 54 at 363 (footnote omitted). Many scholars have cited the case of *Christy Brothers Circus v. Turnage,* 38 Ga.App. 581, 144 S.E. 680 (1928) (overruled in *OB–GYN Associates of Albany v. Littleton,* 259 Ga. 663, 386 S.E.2d 146, 149 (1989)), as the pinnacle of the absurdity of the physical impact rule. In that case, a young woman attending a circus recovered $500 for the emotional distress she suffered when a circus horse "evacuated his bowels" onto her lap during the performance, based upon the court's determination that she suffered an impact with what landed in her lap. It is incongruous that the utilization of the impact rule could result in a clearly genuine and severe emotional distress being denied recovery due to the lack of a physical impact, when a minor emotionally distressing event, such as the circus horse incident, would result in recovery based purely on the existence of a minor physical impact.

Indeed, forty years ago, Justice Musmanno railed against the impact rule. Although the focus of his rhetoric was directed at the failure to adopt the bystander rule, which was later adopted in *Sinn*, his logic equally applies to the current incarnation of the impact rule as a requisite element of NIED. Justice Musmanno referenced a prior case in which the majority of the Court denied a woman recovery for NIED when she was charged by a bull and suffered a heart condition as a result of the fright, despite any physical impact from the bull; Justice Musmanno opined:

> The rule that there must be the mechanical requirement of impact, before recovery will be permitted, charges with lowered head against the stone wall of the most elementary phenomena observable practically every day. The impact rule presupposes that there can be no damage done to man's physical structure unless a material object dashes against it. Yet we know that people die of fright, persons faint from shock, and individuals collapse from grief, without any of these unfortunates having been touched by the event which precipitated the disastrous result.

*Knaub v. Gotwalt*, 422 Pa. 267, 220 A.2d 646, 649 (1966) (Musmanno, J., dissenting).

Given this experience in Pennsylvania and beyond, we conclude that the physical impact requirement is a flawed tool to distinguish between true emotional distress deserving recovery and the trivial or fraudulent emotional distress claims that should not result in liability. The existence of a physical impact or the fear of such impact may certainly result in emotional distress as we have seen on repeated occasions. However, we acknowledge that severe emotional distress can arise equally from situations without any physical impact. Accordingly, we would hold that NIED claims do not require a physical impact as an element of the tort.

A plaintiff asserting a special relationship NIED cause of action absent physical injury, however, must still demonstrate the genuineness of the alleged emotional distress, in part, by proving the element of causation. Unlike cases involving a physical impact, a plaintiff in a non-impact case faces a more

difficult task of convincing a court of the legitimacy of the emotional distress and the causal nexus between the negligent action at issue and alleged distress. Indeed, we can foresee cases where a trial judge may determine that no jury could reasonably differ as to whether the plaintiff has sufficiently established a causal link. In such cases, our trial courts are charged with performing their standard gatekeeping function in determining which cases should be permitted to be argued to a jury. *See, e.g., Ford v. Jeffries,* 474 Pa. 588, 379 A.2d 111, 114 (1977) ("The determination of whether the conduct of the defendant was a substantial cause or an insignificant cause of plaintiff's harm should not be taken from the jury if the jury may reasonably differ as to whether the conduct of the defendant was a substantial cause or an insignificant cause."). As a final element, plaintiffs asserting a special relationship NIED claim must demonstrate damages resulting from the alleged negligent infliction of emotional distress.

In regard to the case at bar, we conclude that Defendants did owe Plaintiff an implied duty to care for her emotional well-being, and that it was foreseeable that a breach of this duty could result in severe emotional disturbance causing physical injuries to Plaintiff. Here, Defendants were performing a medical procedure in a sensitive area of practice fraught with emotions of expectant parents. Moreover, had this same negligence resulted in the failed ability to treat the infant, there is no question that the doctors would have been liable for injuries suffered under standard medical malpractice law. In regard to the element of breach, Plaintiff presented sufficient evidence to argue to a jury that Defendants breached their duty by misreading the ultrasound.

We acknowledge, however, that the third and fourth elements of this negligence cause of action, issues of causation and damages, present questions that are more difficult to answer. Concerning causation, Plaintiff argues that the Defendants' misinterpretation of the ultrasound directly resulted in her severe emotional distress because it prevented her from preparing herself for the shock of witnessing the birth of her child with profound deformities. Alternatively, Defendants

aver that Plaintiff would have suffered the emotional distress regardless of their actions, as nothing they did caused the child's deformities nor could anything have been done to ameliorate the problems if the ultrasound had detected the deformities. Keeping in mind our standard of review for preliminary objections in the nature of a demurrer, we conclude that, after accepting all the pleaded facts and all reasonable inferences as true, this case should be allowed to go forward. *Bilt–Rite Contractors, Inc. v. The Architectural Studio*, 581 Pa. 454, 866 A.2d 270, 274 (2005) ("[T]he question presented by the demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible. Where a doubt exists as to whether a demurrer should be sustained, this doubt should be resolved in favor of overruling it.") (citation omitted).

Moreover, if the case concludes in a trial and a jury finds in Plaintiff's favor on the issue of causation, it will then be up to that jury to determine the issue of damages by valuing the emotional distress Plaintiff claims she suffered. In this regard, the jury's task will be no more ephemeral or taxing than in any case where a jury weighs and awards general damages.

In light of all of the above, we conclude that Plaintiff has stated a cause of action viable under Pennsylvania law for emotional distress and resulting physical harm, and given our standard of review, the case should not have been dismissed on preliminary objections. Accordingly, we would affirm the Superior Court's decision to vacate, and we remand the case to the trial court for further proceedings consistent with this opinion.

The Court being evenly divided, the order of the Superior Court is affirmed by operation of law.

Justice TODD and McCAFFERY join the lead opinion in support of affirmance.

Justice TODD, in support of affirmance.

I join the comprehensive and erudite Opinion in Support of Affirmance by Justice Baer ("OISA") in full, but make the following comments.

I agree with the OISA that we should dispense with the impact rule for claims of negligent infliction of emotional distress. In my view, continuing to apply the impact rule in such cases in order to lessen the risk of feigned claims of emotional distress would suggest that we do not trust our juries (or our judges sitting as fact finder) to discern the difference between real and fraudulent or trivial claims, to judge the credibility of a plaintiff's claims of emotional distress, or to assess whether a claimed causal connection between a tortfeasor's act and the alleged emotional distress is likely. Indeed, to maintain the impact rule would be to reject the very premise of our jury system and deny redress for legitimate claims of emotional injury.

Further, I conclude that the factors the OISA cites, but that are not explicitly applied, warrant the imposition of a duty in this case. See 36 A.3d at 95 n. 11 (quoting *Bilt–Rite Contractors, Inc. v. The Architectural Studio,* 581 Pa. 454, 472, 866 A.2d 270, 281 (2005)) ("The determination of whether a duty exists in a particular case involves the weighing of several discrete factors which include: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution." (internal quotation marks omitted)); *see also Althaus ex rel. Althaus v. Cohen,* 562 Pa. 547, 553, 756 A.2d 1166, 1169 (2000). After consideration of these five factors, I agree that a doctor has a duty to care for a patient's emotional well-being under the circumstances of this case.

Finally, I observe that the OISA generally and wisely leaves to our trial courts the case-by-case assessment of what other societal relationships might likewise warrant the imposition of such a duty.

Chief Justice CASTILLE, in support of reversal.

I join Mr. Justice Saylor's Opinion in Support of Reversal, save for the first paragraph of the expression, which adverts to Justice Saylor's Dissenting Opinion in *Freed v. Geisinger*

*Med. Ctr.*, 607 Pa. 225, 5 A.3d 212, 228 (2010). *See* Opinion in Support of Reversal Slip Op., Saylor, J., at 1. I wrote separately in *Freed* and there, as elsewhere, I have expressed a view concerning procedural matters in these cases which is not entirely aligned with the views of my erudite colleague. On the substantive question presented in this case, however, where the Justices favoring affirmance would determine, as a matter of policy, to innovate new liabilities in tort for health care providers, I am entirely in accord with Justice Saylor's views.

Justice SAYLOR, in support of reversal.

Elsewhere, I have set down my thoughts concerning the analysis which should be undertaken in considering procedural changes in the medical professional liability litigation arena. *See Freed v. Geisinger Med. Ctr.*, 607 Pa. 225, 245–52, 5 A.3d 212, 225–29 (2010) (Saylor, J., dissenting) (discussing various social phenomena impacting health care providers and their patients in Pennsylvania in terms of risk, cost, access, and quality of care). I reached the conclusion that, in light of the important conflicting interests involved, "it is very clear that the necessary regulation of the medical malpractice litigation arena requires difficult social policy judgments appropriate to the legislative branch." *Id.* at 250–51, 5 A.3d at 228.

I find such commentary to be all the more pertinent to the present circumstances, in which the Court assumes a common-law policymaking role to address the breadth of health-care providers' *substantive* liabilities, an arena far better suited to the province of our General Assembly. *Cf. Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PriceWaterhouseCoopers, LLP*, 605 Pa. 269, 301 & n. 27, 989 A.2d 313, 332–33 & n. 27 (2010) (referencing the Legislature's superior policymaking resources and commenting that responsible decision-making in areas of public impact requires consideration of broader potential social effects). From my perspective, experience with such judicial policymaking ventures sharply demonstrates the need for deep reflection and judicial self-restraint. *See, e.g., Bugosh v. I.U. N.*

*Am., Inc.*, 601 Pa. 277, 279–98, 971 A.2d 1228, 1229–40 (2010) (Saylor, J., dissenting, joined by Castille, C.J.) (commenting on the impaired state of common-law strict products liability jurisprudence in Pennsylvania). *See generally Cafazzo v. Cent. Med. Health Servs., Inc.*, 542 Pa. 526, 537, 668 A.2d 521, 527 (1995) ("[B]efore a change in the law is made, a court, if it is to act responsibly must be able to see with reasonable clarity the results of its decision and to say with reasonable certainty that the change will serve the best interests of society." (quoting *Hoven v. Kelble*, 79 Wis.2d 444, 256 N.W.2d 379, 391 (1977))).[1]

I acknowledge the very difficult circumstances facing Appellee and her son, and the strong potential that she might have been better prepared for what was to come had she learned earlier of her son's physical impairments than at his birth. Assuming a wrong was inflicted on Appellee related to this inability to prepare, all Justices agree that our present law does not afford redress for this type of injury. *See* Opinion Announcing the Judgment of the Court, *slip op.* at 10 n. 8, 24. *See generally Schmidt v. Boardman Co.*, 608 Pa. 327, 366–68, 11 A.3d 924, 948–49 (2011) (opinion in support of reversal, in relevant part) (Saylor, J., joined by Castille, C.J., and Eakin, J.) (discussing the genesis of the theory of negligent infliction

1. In the realm of healthcare provider liability, referencing a robust legislative presence, one commentator explained as follows:

> At the very least, legislative presence provides an important judicial source and anchor to common-law jurisprudence.... This judicial source is not limited to express statutory enactments directly on point but can include legislative policy evident in related enactments, as well as the fundamental role of the legislature to make policy decisions—especially those with far-reaching social consequences. The longstanding legislative presence in the regulation of physicians, the institutional limitations of the courts, and the social ramifications of enlarging significantly physician liability all form a proper boundary to common-law tort liability expansion upon physicians.

Tory A. Weigand, *Lost Chances, Felt Necessities, and the Tale of Two Cities*, 43 Suffolk U.L.Rev. 327, 345–46 (2010) (footnotes omitted); *accord Smith v. Parrott*, 175 Vt. 375, 833 A.2d 843, 848 (2003) ("[T]he decision to expand ... potential liability of the medical profession in Vermont 'involves significant and far-reaching policy concerns' more properly left to the Legislature, where hearings may be held, data collected, and competing interests heard before a wise decision is reached." (citations omitted)).

of emotional distress and the associated concept of physical impact). Moreover, the judicial system is subject to inherent limits, and there are substantial—sometimes momentous—cost-benefit tradeoffs inherent in decisions to offer new forms of redress. In light of the limitations of modern compensation law, there simply are some wrongs which are not, and should not be made, actionable in courts of law. *See generally* Prosser on Torts § 1 (4th ed.1971), *cited in Armstrong v. Paoli Mem. Hosp.*, 430 Pa.Super. 36, 42, 633 A.2d 605, 608 (1993).

I find the present circumstances to be within this category, particular where the Court has not been presented with the kind of empirical information necessary to make an informed decision expanding healthcare provider liability beyond current boundaries.

In terms of the practicalities, I also note that the opinion in support of affirmance does not detail how damages are to be assessed relative to the new cause of action it sanctions. It is evident that Appellee would have experienced emotional suffering upon and after her son's birth, regardless of any and all amounts of preparation. Presumably, in assessing damages, a jury would be required to separate such suffering from the additional distress caused by the unpreparedness. Such division is akin to one required in automobile crashworthiness cases between the hypothetical injury which would have ensued had the defendant-manufacturer taken adequate safety measures and the actual harm suffered on account of the associated defect. *See Harsh v. Petroll*, 584 Pa. 606, 609–10 n. 1, 887 A.2d 209, 211 n. 1 (2005) (discussing crashworthiness doctrine). The difficulties with such an abstract analysis obviously are magnified when dealing with injuries deriving from emotional suffering as opposed to physical injury. *Cf.* Brief for Appellants Chester County Hosp., *et al.* at 46 ("[I]f the theory is the defendant's conduct merely prevented an opportunity to anticipate the shock, there is absolutely no evidence or precedence to permit the conclusion that medical science now is capable of identifying what amount of the inevitable shock might have been avoided by the opportunity

to anticipate it.").  In this regard, I have serious reservations about the practical consequences of introducing what is essentially "emotional crashworthiness" liability into the healthcare arena.

In summary, on this record—and in light of the already complex and risk-laden environment in which those who practice medicine must operate, as well as the undeniable social utility of their collective efforts—I differ with the lead Justices' conclusion that the present expansion of their liability exposure is justified.

Justice EAKIN joins this Opinion in Support of Reversal.